825 So.2d 1134 (2002)
Bradley COLE, Individually and on Behalf of his Minor Child, Leah Ashton Cole, and Denise Cole, Individually,
v.
STATE of Louisiana, DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS.
No. 2001-C-2123.
Supreme Court of Louisiana.
September 4, 2002.
*1136 Richard P. Ieyoub, Attorney General, David G. Sanders, New Orleans, for Appellant.
Jules B. LeBlanc, IV, Baton Rouge, LeBlanc, Maples & Waddel, Christopher C. McCall, Robert C. McCall, Lake Charles, Baggett, McCall, Burgess & Watson, for Respondent.
JOHNSON, Justice.
The State, through the Department of Public Safety and Corrections appeals the judgment of the lower courts, finding that the plaintiff, Bradley Cole, was the subject of an intentional tort at his place of employment, and was therefore entitled to damages in tort. We granted the State's writ application to determine the correctness of the lower courts' decisions. Cole v. State of Louisiana, through the Department *1137 of Public Safety and Corrections, 802 So.2d 638 (La. 2001). For the reasons stated herein, we conclude that the evidence supports the lower courts' findings that plaintiff was the subject of the intentional tort of battery, but the lower courts erred in awarding damages for the closed head injury.

FACTS AND PROCEDURAL HISTORY
Plaintiff, Bradley Cole, was a correctional officer at the Phelps Correctional Center in DeQuincy, Louisiana, where he had been employed for approximately seven years and was a member of the tactical unit. The tactical unit was a group of correctional officers trained to take charge of any situation involving inmate riots or disturbances. Cole was injured during a training exercise on October 19, 1995, when he traveled with his unit to Hunt Correctional Center for training with tactical units from Hunt and other institutions around the State. On September 17, 1996, Cole, individually, and on behalf of his minor child and Cole's wife, Denise Cole, filed suit against the Department of Public Safety and Corrections (DPSC) alleging Cole was intentionally battered by other officers during the DPSC-controlled exercises.
A five-day bench trial was held to determine liability on the merits. Cole, along with several officers who participated in the training exercises, testified at trial as to the events that transpired throughout the course of the exercises on the date of Cole's injury, as well as to their past experiences with these types of training exercises.
The testimony presented at trial revealed that on the date of the injury, there was a total of five training exercises conducted at the Hunt facility. These training exercises were simulations to prepare officers for inmate disturbances or riots with some officers assuming the role of prisoners. Cole participated in the first two exercises of the day without injury. The third exercise, in which Cole was injured, took place on the firing range and was called the "angry crowd exercise." In this exercise, Cole and the Phelps unit role-played as inmates, while two other institutions role-played as guards. Cole testified that prior to this date, his tactical unit had never participated in training exercises with other institutions and that during previous exercises with his unit, when batons were used, the batons were wrapped in Styrofoam and officers wore protective pads. However, during this angry crowd exercise, unpadded batons were used and the officers only wore helmets for protection. Cole described the exercise as a "free-for-all." He testified that someone grabbed him and started hitting him on his left arm at full force. He testified that even though he shouted "red," the code word which was supposed to stop the activity, he continued to get hit. He testified that at some point his helmet came off and he continued to be struck with the unpadded batons. Cole could not identify which officer(s) struck him. According to the record, Cole was seen in the emergency room at St. Patrick's Hospital where he complained of pain in his left arm, shoulder, and neck. The first report of injury filed with his employer stated that Cole had been injured during a tactical unit practice and listed complaints of injury to his left hand, arm and shoulder.
Colonel Milton Scarbrough, the tact team commander at Phelps, testified that he knew batons would be used but did not expect that full force strikes would be used during the exercise. He did, however, state that during the angry crowd exercise, he expected that one could get "banged up" or "hurt." Colonel Scarbrough *1138 testified that he first learned that Cole was injured at the end of the last exercise when Cole approached him and stated that he had been "whacked" in the arm. Scarbrough stated that Cole did not tell him about yelling "red"the code to stop the blowsnor did he tell him that he was continually struck after yelling "red."
Roy Williams, Lieutenant Colonel at the Phelps Center, who also participated in the exercises in question, was able to identify Cole in still photographs and video tape at trial and testified that Cole in fact had his helmet on until the exercises were complete. Colonel Williams testified "tact team training is a physical type of training. We very commonly have done various exercises, gas training, forced cell entries where the officers could reasonably expect to kind of get scuffed up and might be red or bruised, but certainly if we thought it was a significant injury, we would get them to medical [sic] and have them treated. And we tried to avoid that to the extent possible, but it is just a physical type training."
Captain John Harvey also participated in the angry crowd exercise and testified that the exercise just "broke down," describing it as "chaotic." Captain Harvey explained that "there really was no order to it after everything got started."
After weighing the testimony and evidence, the trial court, without elaboration, written or oral, rendered judgment in favor of Cole, finding that Cole had established that DPSC was liable for his injuries. Subsequently, the trial court heard oral argument on the issue of quantum and rendered judgment awarding $675,000 in general damages, $157,000 in future medical damages, and $914,390 in lost wages, subject to credit for workers' compensation payments. The trial court also awarded damages for loss of consortium to Cole's wife and daughter, $75,000 and $35,000, respectively.
The court of appeal, in an unpublished opinion, 800 So.2d 445, affirmed the judgment of the trial court finding no manifest error. Relying on Rosell v. ESCO, 549 So.2d 840 (La.1989), found that although the acts of DPSC employees in striking Cole were not malicious, these acts were nonetheless harmful and done with intent. The court also found that there was no manifest error in the trial court's finding that Cole received serious injuries from the battery he received, including brain trauma related injuries, headaches, and injuries to his neck and shoulder and that these injuries resulted from the intentional battery.
DPSC now appeals to this Court asserting the same assignments of error.

DISCUSSION
Generally, any action by a worker against his employer for injuries suffered during the course and scope of employment would be exclusively through the Workers Compensation Act, La. R.S. 23:1032, which provides immunity from civil liability in favor of an employer. It is well settled that under the provisions of La. R.S. 23:1032, a worker is ordinarily limited to recovering workers' compensation benefits rather than tort damages for these injuries. However, Sec. 1032(B) provides an exception to this exclusivity when a worker is injured as a result of an employer's intentional act. White v. Monsanto Company, 585 So.2d 1205 (La.1991); Mouton v. Blue Marlin Specialty Tools, Inc., 2001-648 (La.App. 3 Cir. 10/31/01), 799 So.2d 1215; LaPoint v. Beaird Industries, Inc., 34,620 (La.App. 2 Cir. 5/9/01), 786 So.2d 301; Gallant v. Transcontinental Drilling Company, 471 So.2d 858 (La. App. 2 Cir.1985). When a plaintiff sustains damages as a result of an intentional *1139 battery committed by a co-employee during the course and scope of employment, the exclusivity provisions of the Louisiana Workers' Compensation Act do not apply. See Quebedeaux v. Dow Chemical, 2001-2297 (La.6/21/02), 820 So.2d 542. Thus, we must now determine whether the lower courts erred in finding that the injuries Cole sustained were suffered as a result of "intentional acts"of DPSC employees and, therefore, not subject to the workers compensation statute.
DPSC argues that the trial court committed manifest error in finding that Cole was intentionally battered, and thus, the intentional act exception to the workers' compensation act does not apply. DPSC relies on Reeves v. Structural Preservation Systems, 98-1795 (La.3/12/99), 731 So.2d 208, wherein this court had occasion to address the issue of the intentional act exception to the Workers' Compensation Act. In that case, the employee was instructed by his foreman to move a sandblasting pot which weighed approximately 350 to 400 pounds empty. The pot had warning stickers on it, required by OSHA, which read "Do Not Move Manually." All parties conceded the proper way to move the pot was to affix it to a pallet and move it with a forklift or heister. At previous job sites, the pot was moved by a forklift. However, the employer decided on this occasion that a forklift or heister was not necessary to remove the pot from the pallet. The foreman twice asked "upper management" for a tow motor or forklift to move the metal pot, but the requested equipment was never supplied. The foreman testified because he feared someone would eventually get hurt moving the pot manually, he sometimes moved the pot manually himself. When the plaintiff, Reeves, attempted to move the pot, it fell on him crushing his knee and injuring his back. In reversing the lower courts' finding that an intentional tort had been committed, this Court examined and summarized the history of the Workers' Compensation Act and the intentional act exception as follows:
As amended in 1976, Section 1032(B) reads:
Nothing in this Chapter shall affect the liability of the employer, or any officer, director, stockholder, partner or employee of such employer or principal to a fine or penalty under any other statute or the liability, civil or criminal, resulting from an intentional act.
La. R.S. 23:1032(B).
The legislative history is very enlightening as to the intent of the legislature in drafting this exception. The amendment was introduced as House Bill No. 354 and contained an exception from the exclusive coverage of the Act for the liability of the employer resulting from "an intentional or deliberate act." The House debated and rejected two amendments offered on the bill. The first amendment would have provided an award of double the normal compensation against an employer when the death, injury or disease "is caused by the employer's violation of a recognized safety rule or regulation, his failure to provide a safety device required by a recognized safety rule or regulation or by a statute, or by gross negligence on the part of a supervisory employee...." Official Journal of the House of Representatives, June 4, 1976, H.B. 354, p. 20. The second amendment would have provided that the exclusive coverage of the Act did not apply "if such injury or compensable sickness or disease is caused by the gross negligence, as hereinafter defined, of said party or parties. Gross negligence exists when there is such disregard of the interest of others that the tortfeasor's conduct amounts to *1140 a gross deviation below the standard of care expected to be maintained by a reasonable careful man under like circumstances. Ordinary negligence sufficient to sustain a cause of action under Article 2315 of the Louisiana Civil Code is not sufficient to constitute gross negligence as defined in this section." Official Journal of the House of Representatives, June 4, 1976, H.B. 354, p. 21. The Senate likewise debated and rejected two similar amendments. Official Journal of the Senate, July 12, 1976, p. 42. The Senate also removed the words "or deliberate" from the bill without objection. Official Journal of the Senate, July 12, 1976, p. 41. As commentators have stated, "[t]he only reasonable conclusion to be drawn from the legislative process is that both houses of the legislature rejected attempts to make the exception any broader than `intentional' acts of the employer, thereby giving the exception a narrow scope, limited to conduct which is truly intentional." Malone & Johnson, Louisiana Civil Law Treatise, Volume 14, Workers' Compensation Law & Practice, § 365, p. 206 (3 rd ed.1994). "Even if the alleged conduct goes beyond aggravated negligence, and includes such elements as knowingly permitting a hazardous work condition to exist, knowingly ordering claimant to perform an extremely dangerous job, or willfully failing to furnish a safe place to work, this still falls short of the kind of actual intention to injure that robs the injury of accidental character." Larson, 2A Workmen's Compensation Law, § 68.13 (1989).
We explained further, in Reeves that an "intentional act" means the same as "intentional tort" in reference to civil liability. The meaning of "intent" in this context "is that actor who acts either (1) consciously desires the physical result of his act, whatever the likelihood of that result happening from his conduct; or (2) knows that the result is substantially certain to follow from his conduct, whatever his desire may be as to that result." Id. at 211 (quoting Bazley v. Tortorich, 397 So.2d 475, 481 (La.1981)) In Bazley, where the plaintiff did not allege that his co-employee either desired the consequences of his acts or believed they were substantially certain to follow his acts, we held that the co-employee's acts of operating a garbage truck without a working horn, disregarding mechanical and electrical maintenance standards, failing to keep a lookout, failing to stop in a safe place and failing to warn plaintiff of danger did not amount to an intentional act.
We noted in Reeves, supra, that this Court and the appellate courts have narrowly construed the intentional act exception. Under such narrow construction, the jurisprudence has held, almost without exception, that "violation of a statute alone is not per se such an intentional act." See Mott v. River Parish Maintenance, Inc., 432 So.2d 827, 832 (La.1983) (violation of Child Labor Law). Violations of safety standards or the failure to provide safety equipment are not intentional acts absent proof of either defendants' desire to harm plaintiff or defendants' knowledge that their conduct would inevitably cause injury to plaintiff. Casto v. Fred's Painting, Inc., 96-405 (La.App. 5 Cir. 1/15/97), 688 So.2d 72, rev'd, 97-0374 (La.4/4/97), 692 So.2d 408; see also Alexander v. Ingersoll-Rand, 95-1816 (La.10/27/95), 661 So.2d 1365.
Since Reeves, the intentional act exception has continued to be narrowly construed. In Faust v. Greater Lakeside Corp. 1998-2853 (La.App. 4 Cir. 9/12/01), 797 So.2d 748, the court held that the plaintiffs had not proved an intentional act by their employer, where the plaintiffs alleged that their employer committed an *1141 intentional tort by failing to take security measures to protect them and failing to act upon illicit behavior of other employees. There, the court found the plaintiffs' allegations persuasive that the employer was negligent or even grossly negligent for failing to implement security measures and also failing to appropriately respond to plaintiffs' concerns.[1] The court found that the employer's conduct was egregious in that it fell woefully short of protecting the interests and welfare of its' employees. Nonetheless, relying on Reeves, the court found that this was not enough to impute intent.
It is clear from this review of legislative history and jurisprudence interpreting the meaning of intent that the intentional tort exception to the exclusivity of the workers compensation act in general is to be applied in very strict and limited circumstances. Nevertheless, when an employee seeks to recover from his employer for an intentional tort, a court must apply the legal precepts of general tort law related to the particular intentional tort alleged in each case in order to determine whether he has proved his cause of action and damages recoverable thereunder. In support of his position, Cole relies on Caudle v. Betts, 512 So.2d 389 (La. 1987), the leading case on the tort of battery. In Caudle, as in the present case, the plaintiff employee sought to recover damages as the result of an intentional tort, a battery committed upon him by his employer's chief executive officer (CEO). In that case, the employees were engaged in horseplay with an electric automobile condenser. The CEO joined in the activity and, as a practical joke, shocked the back of plaintiff's neck with the charged condenser and chased plaintiff with it until he escaped by locking himself in an office. In Caudle, we defined a battery as "a harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff to suffer such a contact." In finding that the electrical shock administered to the plaintiff in Caudle was an intentional tort, we found that the intention need not be malicious nor need it be an intention to inflict actual damage, but it is sufficient if the actor intends to inflict either a harmful or offensive contact without the other's consent. Caudle, supra at 391. We stated further that the defendant may be liable although intending nothing more than a good-natured practical joke, or honestly believing that the act would not injure the plaintiff, or even though seeking the plaintiff's own good. Id.
Cole further relies on Jackson v. Frisard, 96-0547 (La.App. 1 Cir. 12/20/96), 685 So.2d 622, writ denied, 97-0193 (La.3/14/97), 689 So.2d 1386, 97-0201 (La.3/14/97), 689 So.2d 1387. In that case, the plaintiff, Jackson, was injured during an in-service defensive tactics training session at the State Police Training Academy. Jackson and defendant, Ronald Frisard, were partners for the purpose of practicing the defensive techniques being taught during the session. At the time of Jackson's injury, the participants were watching a demonstration on how to deliver a disabling blow without causing permanent injury. Jackson testified that he was on his hands and knees watching the instructor, Sergeant Aubrey Furtrell, when he heard an utterance from Frisard and then *1142 felt a blow to his back. He recalled the force of the blow laid him flat out on the canvass and he was disoriented for about twenty minutes. Jackson further recalled that there was a discussion between Frisard and Furtrell during which Frisard acknowledged he had hit Jackson in the back but that Frisard had not intended to hurt him. Jackson also remembered Furtrell commented that he was concerned about horseplay because injuries had occurred during these training exercises in the past. The trial court found that Frisard struck Jackson while engaged in horseplay during the training session and that such conduct was an "intentional act" under La. R.S. 23:1032. Relying on Caudle's rationale, the court of appeal affirmed the finding that Jackson proved that he was the subject of an intentional act.
Applying the above precepts to the facts of the instant case, we find that the lower courts did not err in finding Cole's injuries were the result of the intentional tort of battery as the evidence supports such a finding. There indeed exists a reasonable factual basis for the trial court's finding that plaintiff met his burden of proof on the elements of battery, since striking a person with a baton is at the very least a "harmful or offensive contact." Further, although the officer(s) who struck Cole with the unpadded batons may not have had malice nor intended to inflict the actual damages Cole suffered, the striking with the batons was indeed an intentional act. Despite DPSC's attempt to distinguish the cases, we find that the instant case is not only analogous to Caudle and Jackson, in which the courts found that an intentional tort had occurred, but is in fact a stronger case for finding that the elements of the intentional tort of battery are met. The facts of the instant case are almost identical to the facts in Jackson, the only differentiating factors being that horseplay was involved and the exact person who committed the battery upon Jackson was identified. If the actions of the employees in Caudle and Jackson, involving injuries as result of horseplay activities where there was clearly no intent to cause actual damage, were held to be intentional torts, then surely the actions of the officers in the instant case meet the requirements of an intentional tort. Striking someone at full force with an unpadded baton is indeed a harmful or offensive contact intending that person to suffer such a contact. Accordingly, we find that the elements of the intentional tort of battery are met in this case.
Having concluded that Cole was the victim of a harmful or offensive contact, we now turn to DPSC's argument that Cole should not be allowed to recovery because he consented to the battery. The defense of consent in Louisiana operates as a bar to recovery for the intentional infliction of harmful or offensive touchings of the victim. Andrepont v. Naquin, 345 So.2d 1216 (La.App. 1 Cir.1977), 345 So.2d 1216. Consent may be expressed or implied; if implied, it must be determined on the basis of reasonable appearances. Id. at 1219.
As the court of appeal noted, "the record contains no consent forms, and there is no testimony that anyone specifically elicited Cole's consent or explained to him that unpadded batons or full force physical altercations would be part of the training exercise that day." (Slip opinion at 6 n. 2). DPSC maintains that Cole consented to strikes by volunteering for the tactical unit and receiving premium pay for such. However, the evidence reveals that Cole never participated in any training exercises which involved full force strikes or the use of unpadded batons. Cole testified that he did not expect a full force altercation during the angry crowd *1143 exercise and he certainly did not expect or consent to being struck with an unpadded baton at full force. Thus, the assertion that Cole consented to the battery simply because he was a member of the tactical unit is absurd. Although it is conceivable that Cole expected or even consented to possible injury during an actual riot or disturbance, it does not follow that Cole anticipated or consented to such brutality during a training session. The testimony from the participating officers reveals that this was supposed to be a low key, half speed exercise, the purpose of which was to practice formations and movement on the field. Simulated strikes were to be conducted, but no one expected a full force altercation. Accordingly, we conclude that the evidence supports the findings of the lower courts that Cole did not consent to the battery.
Even assuming arguendo that Cole did initially consent to this harmful touching during the training exercise, we find that under the circumstances of this case, any consent given by Cole was vitiated. When a person voluntarily participates in an altercation, he may not recover for the injuries which he incurs, unless force in excess of that necessary is used and its use is not reasonably anticipated. Andrepont, supra, citing White v. Gill, 309 So.2d 744 (La.App. 4th Cir.1975); Buchert v. Metropolitan Life Insurance Company, 219 So.2d 584 (La.App. 4th Cir.1969). The use of unnecessary and unanticipated force vitiates the consent. The court in Andrepont found that while the plaintiff voluntarily consented to engage in a fist fight with the defendant and his friends, the force employed by the defendant was in excess of what was reasonably necessary to repel the advances of the plaintiff and was an implementation of force to which the plaintiff did not consent.
The evidence in this case is clear and overwhelming that the force used against Cole was "unnecessary and unanticipated." As stated, Cole clearly did not anticipate being struck with unpadded batons, as evidenced by his testimony along with the testimony of other Phelps tact team members. We find that the force Cole received was also unnecessary to accomplish the goal of the training exercise. Cole's expert in field training, Ken Katsaris, testified that regular batons and full force should never be used and were unnecessary to this type of training exercise. Accordingly, we affirm the lower court's findings that Cole's injuries were a result of the intentional tort of battery; thereby, allowing him to recover damages under Louisiana tort law.
We now turn to the issue of damages. It is not disputed that Cole sustained some type of injury while participating in tactical unit training exercises. DPSC does not dispute the lower courts' findings that Cole suffered injury to his forearm, neck and/or shoulder, as evidenced by medical records. The medical evidence revealed that Cole underwent a cervical diskectomy and fusion on February 5, 1996, and a foraminotomy with decompression of the left C4 and right C6 nerve roots on July 14, 1997. In addition, Cole underwent orthoscopic shoulder surgery on May 16, 1996 and an open arthrotomy on January 30, 1997.
DPSC disputes the lower courts' findings that Cole suffered a closed head injury, contending that there is no evidence of any trauma to his head. They maintain that although "touching" occurred throughout the exercises, no evidence was admitted which showed that any individual struck Cole in the head. DPSC argues that their position is strengthened by the fact that there was no mention of a head trauma in the medical records until more *1144 than five months after the training exercise, when Cole complained to Dr. Fayez Shamich, a neurologist, of severe headaches and blows to the head.
Our review of the trial court's finding that Cole suffered a closed head injury is subject to the manifest error rule. An appellate court may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong, and where two permissible views of the evidence exist, the "fact finder's choice between them cannot be manifestly erroneous or clearly wrong." Stobart v. State of Louisiana, 617 So.2d 880 (La. 1993). The court announced a two part test for the reversal of a fact finder's determinations: 1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and 2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). Mart v. Hill, 505 So.2d 1120, 1127 (La.1987).
This test dictates that a reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's finding. Id. The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. Nevertheless, the issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Stobart, supra. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). However, where documents or objective evidence so contradict a witness's story, or the story itself is so internally inconsistent or implausible on its face that a reasonable fact finder would not credit the witness's story, the court of appeal may find manifest error even in a finding purportedly based upon a credibility determination. Rosell, supra.
After conducting an extensive review of the medical evidence, we find that there is insufficient evidence to support the lower courts' findings that Cole suffered a severe closed head trauma as a result of a battery to his head.
A closed head injury is defined as a head injury in which the scalp and the mucous membranes (of the mouth and nose) remain intact.[2] A closed head injury is caused by an external blow to the cranium that may or may not be sufficient to fracture the skull. Head injuries are generally classified as either mild, moderate, or severe.[3] Even in mild head injury cases, there is a transient loss of consciousness. In moderate head injuries, the period of unconsciousness may last up to one hour and neurological signs may appear. A patient suffering from a severe brain injury may suffer unconsciousness for several hours. Recovery is slow, and a return to consciousness may take from days to weeks. In cases of extremely severe brain injury, the patient suffers trauma to parts of the brain essential to life and shows severe neurologic abnormalities. Sometimes, in spite of all possible treatment, the patient dies within a few hours.
*1145 The court of appeal in the instant case stated, "the overwhelming medical evidence shows that Cole has suffered a `serious closed head trauma'" and found that the great majority of the damages awarded to Cole arise from the closed head injury he suffered. The appellate court found the testimony of Cole's treating physicians supported the head injury. Our review of the record reveals that Cole's presentations of history and complaints to the various doctors were internally inconsistent and inconsistent with the medical definition of a serious closed head trauma. Over time, Cole's description of the battery(ies) and injuries escalated in degree and severity.
On October 24, 1995, Cole was treated by Dr. Foster and related a history that "he had received several blows to his neck, left shoulder and forearm ... He had no headaches." On October 25, 1995, Cole saw Dr. Lynn E. Foret with the following history: "He was at a training exercise and took several blows to his left shoulder, arm and torso. During training, he started experiencing pain, muscle spasms and numbness of left arm and shoulder with a burning sensation of left forearm. At the same time, his middle and pointer fingers wanted to draw inwards and his ring and pinkie finger burned."
On April 2, 1996, Cole saw Dr. Shamieh with the following history of complaints: he was involved in an on-the-job accident while in training. "It took almost 6 officers to put him down. After receiving three blows to the head and pulling of the shoulders, neck and left arm, he started having severe headaches, pain in neck and lower back and shoulder shortly afterward."
On September 11, 1997, plaintiff saw Dr. Andrew G. Lee, a neuro-opthalmologist, and reported a history of being hit multiple times with the butt of weapons and various other objects. Dr. David S. Post, a psychologist, saw Cole on referral from Dr. Foster for neuropsychological testing on July 23, July 24 and August 27, 1997. Cole gave the following history: He was attending a training exercise that involved a simulated riot. He was hit in the head several times and had his helmet ripped off. He was tackled and fell to the ground and was in and out of consciousness, unable to see, hear or feel anything. When the attackers were called off, he was left lying on the ground with pain in his neck, head, shoulder, back, arm and hand.
On November 26, 1997, Cole saw Dr. Kevin Gorin, an expert in physiatry, physical medicine, and rehabilitation on referral from Dr. Foster and gave the following history: "was struck with the butt of weapons, sticks by six officers resulting, closed head injury ... has brain damage, neck, left shoulder left arm in general and back injuries."
Although several doctors diagnosed Cole with a traumatic brain injury, we note that the record is void of any objective medical evidence to support a finding that Cole suffered a serious head trauma. Instead, the testimony of the treating physicians that Cole suffered a head injury is based solely upon the history relayed to them by Cole, without any objective confirmation of such an injury. If an expert opinion is based upon facts not supported by the record, the opinion may be rejected. Davis v. Sonnier, 96-515 (La.App. 3 Cir. 11/6/95), 682 So.2d 910; Meany v. Meany, 94-0251 (La.7/5/94), 639 So.2d 229.
We find it significant that Cole did not mention a blow to the head or complain of any headaches, dizziness in the first report of injury. Nor did he have any complaints of head injury when examined in the St. *1146 Patrick's emergency room. Further, there were no neurological signs of any type of head injury indicated in the emergency room medical records. In fact, Cole made no complaints of even a headache until March 13, 1996. There is also no evidence in the record to indicate that Cole suffered any loss of consciousness. Although Cole began to relay a history of headaches and dizziness, there is no objective evidence in the record which would support a finding of head injury.
The inconsistencies in Cole's presentation were in fact noted by some physicians. Dr. Paul Ware performed a neurological examination of Cole and concluded that Cole did not suffer a traumatic brain injury in the incident. Dr. Ware stated that "... there were many inconsistencies in his presentation that made me suspicious , well, that clearly demonstrated to me conscious exaggeration ... This man demonstrated clearly throughout what I would say is elective memory loss. His impairment is in areas that he does not want to remember of for some reason chooses not. His memory is absolutely superb in areas that serve a purpose for him in terms of what's wrong with him."
Dr. Andrew G. Lee, testified as follows: "Based on his history alone, his history alone is consistent with having a closedhead injury and possibly a post-concussive syndrome; but there were no objective eye findings or anything on his neuro-opthalmologic examination or his electrical tests to confirm that." (Emphasis added).
Although the trial court was free to weigh the conflicting testimony of the treating physicians and make its own credibility determinations, we find that the conclusion by the trial court that Cole sustained a serious closed head trauma is clearly wrong as there is nothing in the record to support such a finding. Accordingly, we reverse that portion of the damages awarded to Cole for a closed head injury. In all other respects, the lower courts' decision is affirmed.

CONCLUSION
We find, based on the applicable law and facts of this case, that the lower courts committed no manifest error in finding that the injuries Cole sustained were the result of the intentional tort of battery upon him by DPSC workers, as the evidence clearly supports such a finding. However, we conclude that there was no evidence to support the lower courts' finding that Cole sustained a serious closed head injury as a result of the battery. Because the court awarded general damages, future medicals and lost wages without delineating a portion for the head injury, we must remand this matter to the appellate court to re-assess the award of damages and exclude the amount apportioned for a closed head injury.
AFFIRMED in part REVERSED in part. REMANDED.
VICTORY, J., dissents and assigns reasons.
TRAYLOR, J., dissents and assigns reasons.
KNOLL, J., dissents and assigns reasons.
VICTORY, J., dissenting.
While I agree with the majority that Cole failed to prove he suffered a closed head injury, I must dissent from the rest of the majority's opinion. The actions by the correctional officers during the simulated prison disturbance exercise do not fall under the very narrow intentional act exception to the exclusivity provision of the Workers' Compensation Act.
*1147 In Bazley v. Tortorich, 397 So.2d 475, 481 (La.1981), we explained that in order for an act to be "intentional" under the intentional act exception, the person who acts must either (1) consciously desire the physical result of his act, whatever likelihood of that result happening from his conduct; or (2) know that the result is substantially certain to follow from his conduct, whatever his desire maybe as to that result. In Reeves v. Structural Preservation Systems, 98-1795 (La.3/12/99), 731 So.2d 208, we more fully explained the "substantially certain" requirement as follows:
"`Substantially certain to follow' requires more than a reasonable probability that an injury will occur and `certain' has been defined to mean `inevitable' or `incapable of failing.'" Jasmin v. HNV Cent. Riverfront Corp., supra at 312. "[A]n employer's mere knowledge that a machine is dangerous and that its use creates a high probability that someone will eventually be injured is not sufficient to meet the `substantial certainty' requirement." Armstead v. Schwegmann Giant Super Markets, Inc., 618 So.2d 1140, 1142 (La.App. 4 Cir.1993), writ denied, 629 So.2d 347 (La.1993). "Further, mere knowledge and appreciation of a risk does not constitute intent, nor does reckless or wanton conduct by an employer constitute intentional wrongdoing." Id. (citing Tapia v. Schwegmann Giant Supermarkets, Inc., 590 So.2d 806, 807-808 (La.App. 4 Cir. 1991))
731 So.2d at 213. There was absolutely no evidence presented in this case that the occurrence of an injury was "inevitable" or "incapable of failing." In fact, there was no evidence of previous instances of accidental injuries in these training sessions. The fact that the proper equipment, padded batons and protective pads, were not used, makes this case no different than the numerous other cases in which this Court has rejected the "intentional act" argument when an employer has violated safety rules. See Reeves, supra at 211-212 and cases cited therein. As we said in Reeves, "[b]elieving that someone may, or even probably will, eventually get hurt if a workplace practice is continued does not rise to the level of an intentional act, but instead falls within the range of negligent acts that are covered by workers' compensation." Id. This case does not even reach that level, as there was no prior "workplace practice" of allowing the officers to participate in the "angry crowd" training exercise without the proper safety equipment. At most, to allow the training exercise to proceed as it did can only be characterized as negligent, which does not meet the intentional act exception requirements. Reeves, supra at 212.
The majority also errs in finding that because this act constituted a battery, i.e., "a harmful or offensive contact with a person, resulting from an act intending to cause the plaintiff to suffer such a contact," the act also constitutes an "intentional act." Given the physical nature of the employment and the activity involved, if that were the case, then the entire training exercise was a battery and everyone "contacted" would have an action against the employer in tort. Further, it is clear that as part of his employment, Cole consented to be hit during the exercise, even though he, along with everyone else, did not intend that he be injured.
For all of the above reasons, I respectfully dissent.
TRAYLOR, J., dissenting.
The plaintiff in this case was a member of a specialized correctional facility unit which acted in the event of prison riots and other disturbances. The training complained *1148 of by plaintiff was designed to prepare the officers for high risk purposes and necessitates intensive physical contact between the officers so that they can learn required skills in a controlled environment. Under the jurisprudence, an act such as the one complained of by plaintiff is intentional, and is drawn outside of the realm of workers' compensation, when the defendant either desires to bring about the physical results of his act or believes they were substantially certain to follow from what he did. Bazley v. Tortorich, 397 So.2d 475 (La.1981). I would not find that plaintiff's fellow officers desired to injure plaintiff as he alleges or that such alleged injuries were substantially certain to follow. Therefore, I dissent from the majority's finding that an intentional tort was committed against the plaintiff.
Furthermore, even if the tort was intentional, I would find the entirety of plaintiff's testimony to be incredible based upon the self-serving, uncorroborated testimony of plaintiff regarding his injuries, and the evidence showing that he lied about or at least exaggerated his injuries. The majority discusses that even plaintiff's own doctors stated that he exaggerated and embellished his injuries to them. Also relevant is the fact that no other officer serving the prisoner role in this exercise was injured. Based upon these points and the entirety of the evidence on the record, I would find plaintiff's testimony completely incredible and would determine that the trial court committed manifest error in finding that plaintiff was injured as a result of the tactical exercises.
Accordingly, I dissent.
KNOLL, Justice, dissenting.
I disagree with the majority's conclusion that the lower courts properly determined Cole was the victim of the intentional tort of battery.[1] Although it cannot be gainsaid that the officers struck Cole with their batons, their strikes, as the majority recognizes, were neither malicious nor intended to inflict actual damages. Op. at 1142. However, to better understand my conclusion in light of Caudle v. Betts, 512 So.2d 389 (La.1987), I find it necessary to first examine our jurisprudence on this narrow exception to the law of workers' compensation and to place this exception within the factual context it occurred.
Generally, workers' compensation is the exclusive remedy of an employee injured in the course and scope of his employment. LA.REV.STAT. ANN. § 23:1032. However, LA.REV.STAT. ANN. § 23:1032(B) provides an exception to this tort immunity when the employee's injury is the result of an intentional act. An act is considered intentional whenever the defendant "either desired to bring about the physical results of his act or believed they were substantially certain to follow from what he did." Bazley v. Tortorich, 397 So.2d 475 (La.1981). To meet the criteria of "substantial certainty" requires more than a reasonable probability that the injury will occur. This term has been interpreted as being equivalent to "inevitable," "virtually sure" and "incapable of failing." King v. Schuylkill Metals Corporation, 581 So.2d 300 (La.App. 1 Cir.), writ denied, 584 So.2d 1163 (La. 1991). Further, even where a defendant's conduct is grossly negligent, this fact alone will not allow the imputation of intent. Id.; Hood v. South Louisiana Med. Center, *1149 517 So.2d 469 (La.App. 1 Cir.1987). Finally, as astutely observed in Reeves v. Structure Preservative Systems, 98-1795 (La.3/19/99), 731 So.2d 208, 210, the courts of this state have narrowly construed the intentional act exception according to its legislative intent and have almost universally held that employers are not liable under the intentional act exception for violations of safety standards or for failing to provide safety equipment. Compare Jasmin v. HNV Central Riverfront Corp., 94-1497 (La.App. 4 Cir. 8/30/94), 642 So.2d 311, writ denied, 94-2445 (La.12/9/94), 647 So.2d 1110 (failure to provide safe working environment in grain storage bin); Leger v. Hardy Rice Drier, Inc., 93-1512 (La. App. 3 Cir. 6/1/94), 640 So.2d 650 (maintaining forklift in unsafe condition); Williams v. Gervais F. Favrot Co., Inc., 573 So.2d 533 (La.App. 4 Cir.), writ denied, 576 So.2d 49 (La.1991) (violations of OSHA and other accepted industry safety standards); Dycus v. Martin Marietta Corp., 568 So.2d 592 (La.App. 4 Cir.), writ denied, 571 So.2d 649 (La.1990) (allowing worker to operate dangerous equipment); Holliday v. B.E. & K. Const. Co., 563 So.2d 1333 (La.App. 3 Cir.1990) (knowledge that machine is dangerous and that its use creates a high probability that someone will eventually be injured from such use); Davis v. Southern Louisiana Insulations, 539 So.2d 922 (La.App. 4 Cir. 1989) (failure to provide ladders and scaffolding); Hood v. South Louisiana Medical Center, 517 So.2d 469 (La.App. 1 Cir. 1987) (failure to maintain safe working conditions); Taylor v. Metropolitan Erection Co., 496 So.2d 1184 (La.App. 5 Cir.), writ denied, 497 So.2d 1388 (La.1986) (failure to provide scaffold worker with safety belt); Snow v. Gulf States Utilities Co., 492 So.2d 31 (La.App. 1 Cir.), writs denied, 496 So.2d 349 (La. 1986) 496 So.2d 356 (La.1986) (allowing worker to work too closely to energized wires); Jacobsen v. Southeast Distributors, Inc., 413 So.2d 995 (La.App. 4 Cir.), writ denied, 415 So.2d 953 (La.1982) (failure to provide specifically requested safety equipment); Cortez v. Hooker Chemical and Plastics Corp., 402 So.2d 249 (La.App. 4 Cir.1981) (deficiently designed machinery and disregard of OSHA standards); Erwin v. Excello Corp., 387 So.2d 1288 (La.App. 1 Cir.1980), writs refused, 396 So.2d 1242 and 397 So.2d 1363 (La.1981) with Trahan v. Trans-Louisiana Gas Co., 618 So.2d 30 (La.App. 3 Cir.1993) (employer committed intentional act by repeatedly exposing employee to the chemical mercaptan where employee had become ill on two prior occasions after exposure to mercaptan); Wainwright v. Moreno's, Inc., 602 So.2d 734 (La.App. 3 Cir.1992) (employer committed intentional act by ordering employee to work in a ditch that had caved in the previous day and which looked as though it would cave in again). Likewise, gross negligence does not meet the intentional act requirement. Hood, 517 So.2d at 469; Gallant v. Transcontinental Drilling Co., 471 So.2d 858 (La.App. 2 Cir.1985).
At the time the battery occurred in the present case, Cole and his fellow correctional officers were participants in a simulated prison disturbance exercise. Contact, or battery, is inherent in this exercise, just as contact is inherent in many sport games, e.g., in football practices before the actual football game. The exercise in the present case is part of the training the officer needs to become skilled in handling a prison disturbance. Even though such training may be inherently dangerous, the use of realistic tactical training is essential for the protection of correctional officers and the prisoners they guard. See Traweek v. LaBorde, 30,551 (La.App. 2 Cir. 5/13/98), 713 So.2d 664, writ denied, 98-1933 (La.11/6/98), 727 So.2d 449 (not an intentional *1150 tort for a police officer to be sprayed in the face with pepper spray administered as part of his police training). Although in hindsight it may have been better to use protective styrofoam on the batons because of the attendant risks associated with this exercise, the failure to use this protective equipment does not place plaintiff's claims within the narrow intentional tort exception to workers' compensation detailed in this state's jurisprudence.
In reaching this conclusion, I further find that both Caudle and Jackson v. Frisard, 96-0547 (La.App. 1 Cir. 12/20/96), 685 So.2d 622, writs denied, 97-193 (La.3/14/97), 689 So.2d 1386, 97-201 (La.3/14/97), 689 So.2d 1387, are factually distinguishable. In both of those instances, injury was the result of horseplay.
Moreover, because the plaintiff claims he sought to have the hitting stopped during the training exercise and nothing referenced in the majority opinion shows corroboration of that fact, I find the plaintiff's claim on this assertion rises or falls with his credibility. Having found plaintiff not credible with regard to his alleged head trauma, I find plaintiff's testimony discredited as a whole. Accordingly, I find all of plaintiff's claims for injury associated with this training exercise should fall.
For these reasons, I respectfully dissent.
NOTES
[1] Specifically, the court found that the employer hired one of the employees who committed illicit acts against the plaintiffs without conducting a background check, when taking such precaution would have shown that he had previously been convicted of theft and murder. Furthermore, although one of the plaintiffs had reported the co-employees' threats that he was going to rob the store and injure people, the employer took no action to intercede.
[2] Attorneys' Dictionary of Medicine and Word Finder, J.E. Schmidt, M.D. (2001).
[3] Lawyers' Medical Cyclopedia of Personal Injuries and Allied Specialties, (4th Edition 2001).
[1] Even though I disagree with the majority's ruling on intentional tort, I do agree that the lower courts manifestly erred in finding that Cole suffered a trauma to the head. The videotape shows no such injury. Likewise, it was not until six months after the training exercise that Cole first reported a head trauma to his physician. I agree that his testimony to the contrary is not credible.