877 So.2d 1003 (2004)
BRIGHT MORNING STAR MISSIONARY BAPTIST CHURCH, Plaintiff-Appellee.
v.
Charles E. BROWN and Alberta Brown, Defendant-Appellants.
No. 38,333-CA.
Court of Appeal of Louisiana, Second Circuit.
May 28, 2004.
Rehearing Denied July 14, 2004.
*1005 Evelyn Denise Kelly, Michael Wayne Kelly, Lake Providence, for Appellants.
McIntosh, Fox & Lancaster by John M. Lancaster, Lake Providence, for Appellee.
Before STEWART, DREW and MOORE, JJ.
DREW, J.
A defrocked Baptist pastor and his wife appeal a judgment ordering their removal from their church. We affirm the judgment.

FACTS
Rev. Charles Brown was elected as pastor of Bright Morning Star Missionary Baptist Church ("BMS") in 1997. Rev. Brown subsequently alienated members of the church due to his pastoral style, and they sought to remove him from his position as pastor.
On April 19, 2002, BMS, an unincorporated non-profit association, filed a rule for a temporary restraining order and injunction against Rev. Brown and his wife, Alberta Brown. The rule stated that the Board of Deacons voted on March 22, 1998, to relieve Rev. Brown of his official duties, and that the congregation voted to dismiss Rev. Brown as pastor on April 15, 2002. It was alleged that Rev. Brown continued to conduct services despite the votes against him. It was further alleged that the Browns behaved improperly during services, attempted to elect their own Board of Deacons, and placed a mortgage on church property. BMS prayed for a temporary restraining order prohibiting the defendants from coming within 100 feet of any church property; having contact with or harassing a pastor, deacon, or congregation member; writing checks or making payments from church accounts; or taking any action regarding church property or records. BMS also prayed that the defendants be further ordered to return any property belonging to the church.
On April 25, 2002, the trial court ordered all BMS records to be turned over to the clerk of court in order to determine the church members who would be eligible to vote at a meeting to be held on May 3, 2002, to decide whether Rev. Brown would remain as pastor. Eligible church members would be those individuals who were members prior to April 15, 2002, and who had not subsequently transferred their membership to another church. This order was essentially vacated by stipulation of the parties on May 6, 2002, in order to permit the Louisiana Baptist Association to determine the BMS members eligible to vote and to call a meeting to determine whether Rev. Brown would remain as pastor.
On August 19, 2002, a group of individuals designating themselves as a disgruntled group of members of BMS filed a rule to show cause and for injunctive relief against Rev. Brown and his wife. It was alleged that despite three elections to remove him as pastor, Rev. Brown refused to leave the church. It was also alleged that an election to remove Rev. Brown was never called at the meetings held by the Louisiana Baptist Association. This rule sought essentially the same relief as prayed for in the original petition. The *1006 April 19 petition and this rule for injunctive relief were both verified by a church deacon, John Pritchard, and the acting recording secretary, Stephanie Darden.
The Browns filed the exceptions of lis pendens, lack of procedural capacity, and vagueness. Following three days of testimony, the trial court rendered judgment granting the relief sought by plaintiffs. The Browns were prohibited from entering or coming upon BMS's property; prohibited from interfering with any pastor, deacon, or congregation member in the exercise of religious freedom at BMS; and ordered to return all records, books, checks, keys, and other documents or property belonging to BMS.

DISCUSSION
The Browns' primary contentions on appeal are that the trial court erred in finding that Darden and Deacon Pritchard possessed procedural capacity to bring this action in the name of BMS, and erred in finding that the meetings were legally sufficient to remove the Browns.

Sufficiency of Meeting
BMS conducted two types of meetings: regular meetings and special, or called, meetings. Deacon Albert Howard testified that if a member had an issue that needed to be resolved, that issue would be brought to the deacons for a discussion. After the deacons made a recommendation, a meeting would be called and the issue would be presented to the congregation for a vote. Deacon John Pritchard testified that if a member requested a meeting, the deacons would present it to the pastor, and if the pastor did not want a meeting but the deacons thought the request had merit, then a meeting would be announced in church. Charlie Hill, a church member for 68 years, testified that before a congregation meeting would be held, the meeting time and purpose would first be announced at a church service, where it would normally be read by the church secretary. Generally, the pastor would preside over a meeting. However, if the meeting was about the pastor, such as when the pastor was under charges, then someone else, usually the head deacon, presided.
The exact number of church members could not be determined at trial, as an official roll kept by Secretary Maybelle Simpson was not available. Even Rev. Brown did not know the number of church members. Various witnesses gave estimates on the number. Deacon Howard thought there were 65 members in 1998. Deacon Carl Glass, who was appointed a deacon in June of 2001 and is Rev. Brown's nephew, testified that membership was between 100-125 in 1998, and around 100 in April of 2002. He based his estimates upon the number of individuals drinking wine at the Second Sunday service. However, non-members would also drink the wine. It was stipulated that Rev. Brown and his wife would testify that BMS had 90 to 100 members prior to the litigation.
Of course, not all members showed up at the various meetings. Ellie Howard testified that there were normally around 28 members at a typical regular business meeting. Deacon Pritchard believed that around 30 members would usually show up for meetings.
In any event, regardless of the actual number of church members, issues would be decided by a majority vote of those members present at a meeting. Interestingly, the selection of a pastor would be determined by a majority vote at a scheduled meeting. Rev. Brown agreed that a majority of church members present at a meeting, not a majority of the total church members, controlled. In fact, according to Deacon Howard, there was not even a quorum present when Brown was elected *1007 pastor, as 14 of 65 members voted to elect him. Hill also testified that pastors were elected by a majority of those members present. We note that when the congregation met in January of 2001 to vote on a mortgage, the vote was 21-7.
There was apparently no procedure set forth by BMS for the removal of a pastor. Rev. Brown was unable to tell the court the proper method of dismissing a pastor. He believed, however, that the dismissal of a pastor should follow the same procedure as the selection of a pastor. Rev. Henry Hudson, president of the West Carroll Baptist Association, thought that a majority of a church could remove a pastor.
The first meeting to remove Rev. Brown was held on March 12, 1998. Bobbie Epting recalled that Deacon Howard announced the meeting at church. Deacon Howard testified that the announced purpose of the March 12 meeting was to discuss the grievances against Rev. Brown, but then it was decided after the discussion that many members did not want Rev. Brown to remain as pastor, so a vote was held.
Deacon Howard served as the meeting's moderator. Deacon Pritchard could not recall how many members were present for the meeting, but he felt the majority of the church was there and that a majority of members present voted in favor of removing Rev. Brown. Epting, who served as spokesperson at the meeting, remembered that 17 members voted to dismiss Rev. Brown, while 7 members voted against dismissing him.
Although the minutes from the meeting do not reflect that a vote was taken, Deacon Howard believed that Secretary Maybelle Simpson counted the votes at the meeting. He also thought a majority of the church was present. Deacon Howard stated that he ensured that the meeting and vote were conducted properly. Deacon Pritchard remarked that those members running a meeting would usually just record the number of votes and not write down the names of the voters.
Deacon Pritchard and Deacon Roy Henderson executed an affidavit or verification four days after this meeting stating that Rev. Brown had been removed as pastor. The affidavit, a letter to Rev. Brown outlining the grievances against him, and a list of signatures were sent to Rev. Brown by certified mail later that month. Rev. Brown admitted receiving the affidavit and the grievances. A list purported to be the list of members present at the meeting was introduced into evidence. Rev. Brown thought that some of the names on the list were probably members. Deacon Pritchard was not certain that the list in evidence was the list in question, but he thought it could be because some of the names of the members who voted to remove Rev. Brown were on the list. Epting thought it was a list of names from 1998 and 2000 or 2002.
On March 22, 1998, the congregation met for a second time to determine whether or not Rev. Brown should be removed from his position as pastor. Epting testified that this meeting was called because Rev. Brown's supporters complained about the first meeting. Deacon Howard again presided at this meeting. Deacon Howard recalled that the grievances against Rev. Brown were discussed, but he was not sure if a vote was taken at this meeting. However, Deacon Pritchard testified that the congregation was present at the March 22 meeting and a vote was held, with a majority of the members present and the deacons voting to dismiss Rev. Brown.
A resolution dated March 22, 1998, was signed by Deacons Paul Scruggs, Howard, Pritchard, and Henderson. The resolution stated that the deacons had met in a special *1008 meeting and unanimously passed the resolution to dismiss Rev. Brown as pastor. Deacon Howard considered the resolution to be the deacon board acting on the grievances presented to them and voted on by the congregation on March 12. Deacon Pritchard testified that the church members authorized the deacons to draft the resolution, which was drawn up at an attorney's office.
There was apparently also a meeting held in March with representatives of the West Carroll Baptist Association. Rev. Henry Hudson, President of the West Carroll Baptist Association, testified about meeting with Brown, the deacons, and possibly a few church members. He insisted that the meeting took place on March 22, 1998, and that no vote occurred while he was present. He also claimed that he was presented the typed deacons' resolution at this meeting. Deacon Pritchard testified that the meeting with Rev. Hudson and Rev. Brown was not the same meeting as the meetings with the congregation that were conducted on March 12 and March 22.
Deacon Howard testified that Rev. Brown called a meeting for March 22 after receiving the grievances, but he was not sure if Rev. Hudson was present on that date. Deacon Howard believed that Rev. Hudson may have met with the deacons and Rev. Brown on a date prior to the March 12 meeting. Rev. Brown could not recall meeting on March 22, but he remembered calling a meeting sometime in March of 1998 that was attended by Rev. Hudson. Rev. Brown stated that no vote occurred at this meeting.
A third meeting to remove Brown was held on April 15, 2002. The prior Sunday, Deacon Pritchard stood in church and announced the meeting. Rev. Brown's response was that there would not be a meeting. A revival at Green Grove Baptist Church was scheduled on that date, but it was disputed whether or not Rev. Brown also mentioned the revival when telling the congregation that there would not be a meeting. Those testifying at trial agreed that meetings would generally not be scheduled on the same night as a revival. However, some also testified that in such instances of scheduling conflict, an attempt would be made to reschedule the revival.
Deacon Pritchard related that he did not receive notice of this revival until the meeting was called. Epting claimed that Rev. Brown had earlier stated that they were not going to the revival at Green Grove because BMS was having a youth revival, but that Rev. Brown changed his mind after Deacon Pritchard announced the meeting.
Deacon Pritchard acted as the moderator at the April 15 meeting, and Stephanie Darden was appointed acting recording secretary. Epting motioned to remove Rev. Brown as pastor, the motion was seconded, and Deacon Pritchard called a vote. All 27 adult members present voted in favor of dismissing Rev. Brown. Deacon James Quinn, the husband of Rev. Brown's sister-in-law, testified that he was present for this meeting and a vote did not take place.
The fourth and final attempt to dismiss Rev. Brown was held on July 26, 2002. A notice of this meeting, including its stated purpose of determining whether Rev. Brown would remain as pastor, ran in the West Carroll Gazette on July 24, 2002. In addition, an announcement was made by Renwick Darden at the prior Sunday's services that there would be a meeting to discuss the direction of the church.
Deacon Pritchard was the moderator and Stephanie Darden was the acting secretary at this fourth meeting. Epting motioned *1009 to dismiss Rev. Brown, the motion was seconded, and Deacon Pritchard called for a vote. The vote was 23-0 to remove Rev. Brown as pastor. Four individuals who favored dismissing Rev. Brown came to the meeting after it was adjourned. These four people were allowed to sign their names, but their votes were not included in the vote total.
An appellate court may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong, and where two permissible views of the evidence exist, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Cole v. Department of Public Safety & Corrections, 01-2123 (La.9/4/02), 825 So.2d 1134; Stobart v. State, Dept. of Transp. and Dev., 617 So.2d 880 (La.1993). Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact finder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Cole, supra; Rosell v. ESCO, 549 So.2d 840 (La.1989).
Based upon our review of this record, we conclude that the trial court was not clearly wrong in finding the meetings were legally sufficient to terminate and dismiss Rev. Brown.
We also conclude that the trial court was not manifestly erroneous in also rendering judgment against Alberta Brown. Although Mrs. Brown was not the subject of a vote, the evidence established that Mrs. Brown was as disruptive as her husband in church matters. Stephanie Darden testified that on one occasion during church services, Mrs. Brown screamed at her and messed up her hair. Deacon Pritchard testified that Mrs. Brown coached her husband. His testimony gave the impression that Mrs. Brown, in effect, pulled Rev. Brown's strings. There was also testimony that Mrs. Brown did not announce the July 2002 meeting at church even though the notice of the meeting had been placed on a clipboard for her to read to the congregation. She and her husband came as a package deal, and should go in a package deal.
The Browns additionally argue that the plaintiffs took action in contravention of the trial court's April 25, 2002 ruling. This assertion is without merit as both parties agreed to essentially vacate that ruling on May 6, 2002.

Procedural Capacity
The dilatory exception of lack of procedural capacity raises the issue of want of capacity of the plaintiff to institute and prosecute the action and stand in judgment and/or challenges the authority of a plaintiff who appears in a purely representative capacity. Gibbs v. Magnolia Living Center, Inc., 38,184 (La.App.2d Cir.4/7/04), 870 So.2d 1111.
The trial court found that it was legally sufficient for plaintiffs to file suit either as "Bright Morning Star Missionary Baptist Church, an unincorporated association," or as a "disgruntled group of members of the Bright Morning Star Missionary Baptist Church." The court concluded that BMS was an unincorporated association represented by authorized officers. The court also added that the doctrine of virtual representation gave the plaintiffs the right to sue on behalf of themselves and others similarly situated.
La. C.C.P. art. 689 provides that an unincorporated association has the procedural capacity to sue to enforce its rights in its own name, and appears through and is represented by its president or other authorized officer.
*1010 The doctrine of virtual representation recognizes the right of a few persons to sue on behalf of themselves and all other persons similarly situated. Jennings v. C.S. Lester, 76 So.2d 91 (La.App. 2d Cir.1954).
Charlie Hill agreed that any member of the group who voted in favor of removing Rev. Brown has the right to sue to remove him. Ellie Howard, a church member since 1945, testified that she, Stephanie Darden, Deacon Pritchard, and other members met with their attorney regarding Rev. Brown's removal. She related that their attorney explained to them that he would only need one or two spokesmen in order to file suit on their behalf. They agreed that Darden and Deacon Pritchard would speak for them.
Stephanie Darden testified that a majority of those members present at the July 26, 2002, meeting asked her and others to see an attorney after Rev. Brown refused to leave. Darden also stated that she and Deacon Pritchard were authorized by those who voted for Rev. Brown's removal to represent them and file suit on their behalf. She added that she was appointed spokesperson at their attorney's office.
Deacon Pritchard testified that some church members approached him and requested that he contact an attorney as their representative. He felt that as a deacon he was obligated to do the bidding of the majority of the church members who voted for removal, and that he filed suit while acting as a deacon and officer of BMS.
Epting testified that Deacon Pritchard and Darden were appointed to represent them on the date the trial court issued an order in this matter concerning the times for use of the church. She also testified that they met with their attorney and told him that Deacon Pritchard and Darden represented them.
There was no written authorization for Deacon Pritchard and Darden to sue. Nevertheless, the evidence established that they received verbal authorization. By the nature of his position, Deacon Pritchard was obligated to do the bidding of the many church members opposed to Rev. Brown. Thus, he was an authorized officer under La. C.C.P. art. 689. As recording secretary, Darden was also an officer. Moreover, when the second rule was filed on behalf of disgruntled members of BMS, Deacon Pritchard and Darden were suing not only on behalf of themselves but, pursuant to the doctrine of virtual representation, also on behalf of those similarly situated.
Accordingly, we find no error in the trial court's denial of the exception of lack of procedural capacity.

Lis Pendens
The Browns additionally argue that the trial court erred in denying their exception of lis pendens. La. C.C.P. art. 531 provides that when two or more suits are pending in a Louisiana court on the same transaction or occurrence, between the same parties in the same capacities, the defendant may have all but the first suit dismissed. In this matter, only one suit was pending. In fact, the second rule was filed under the same docket number as the original rule, 25,564. Accordingly, there was no error in the trial court's denial of the exception.

Court Costs
In their final assignment of error, the Browns contend the trial court erred in ordering them to pay all court costs. We defer to the discretion of the trial court and conclude that the trial court did not abuse its discretion in ordering the Browns to pay all court costs.

*1011 DECREE
At appellants' costs, the judgment is AFFIRMED.

APPLICATION FOR REHEARING
Before BROWN, STEWART, PEATROSS, DREW and MOORE, JJ.
Rehearing denied.