DREW, J.
 

 hln this suit alleging the breach of a real estate listing agreement, Willie Ealy and Ezell Ealy (“Ealys”) appeal a judgment ordering them to pay damages and attorney fees.
 

 We affirm.
 

 FACTS
 

 The property that is the subject of this controversy covers approximately 39 acres in a commercial area across 1-20 from Pecanland Mall near Monroe. In 1973, the Ealys’ parents sold this property to Willie, married to Dorothy Ealy at the time, and Ezell, married to Suzanne Ealy at the time, for $10,693.32. Suzanne died in 1997. Three sons, Elton, Eric, and Ezell,
 
 *431
 
 were born of the marriage between Ezell and Suzanne.
 
 [1]
 

 |2On October 23, 2000, the Ealys signed an agreement with Century 21 Shackel-ford-French Real Estate (“Century 21”) to list the property for sale for $3.1 million. Luther Shackelford
 
 [2]
 
 and Bill Durham of Century 21 handled the listing. The listing agreement was a standard form issued by the Northeast Louisiana Board of Realtors. The agreement was scheduled to expire on October 12, 2001, but was extended by addendum to October 16, 2002.
 

 PHM Corporation submitted an offer to buy the property for $1.5 million in October of 2001. The Ealys and Dorothy made a counteroffer of $2.8 million. PHM never responded to the counteroffer.
 

 On October 23, 2002, the Ealys signed another agreement with Century 21 to list the property. Durham lowered the listing price to $2.7 million, but the Ealys changed it to $2.9 million. This second listing agreement expired on October 23, 2004.
 

 Charles Theus, an experienced real estate investor, was President of American Capital and Theus Consulting. Both he and William McConnell were members of Monroe 1-20 South LLC.
 

 Theus, who utilized the services of John Rea Realty and who had recently purchased a tract adjoining the property for $2 million, asked Shackelford about the property. American Capital and Monroe 1-20 South intended to work together to acquire the property. Monroe 1-20 South had been formed for the purpose of acquiring land to develop into a retail shopping center for the Monroe area.
 

 On November 13, 2003, American Capital offered to buy the property for $2.1 million. Willie made a counteroffer for $2,575 million that would expire on November 24, 2003. On that date, American Capital made an offer to purchase the property for $2.25 million. The next month, American Capital made an offer to buy the property for $2.43 million.
 

 On February 12, 2004, American Capital submitted a contract of sale in which it offered $2.4 million to Willie to buy the property.
 
 [3]
 
 Willie drew a line through the offered amount, wrote $2,545 million in its place, initialed the change, and signed the contract. Rachel Theus, Charles Theus’s mother and an officer of American Capital, initialed Willie’s change on February |s20. The contract stated that the closing was to occur no later than September 1, 2004.
 

 While the closing was pending, an offer to purchase the property for $1.17 million was made on May 6, 2004, by John Rea Realty, which was apparently representing a buyer other than Theus or his associates.
 
 [4]
 
 Willie drew a line through the amount, and wrote a counteroffer for $2.8 million. Willie also wrote that his counteroffer was a “back offer” that would go into effect on September 2, 2004.
 

 On August 2, 2004, Ezell wrote a letter to Shackelford in which he stated that following up on their July 30, 2004, conversation, he was in total disagreement with the offers and counteroffers that had been presented by Shackelford and Willie. Ezell added that Willie was not authorized to negotiate on his behalf, and that he had
 
 *432
 
 not signed any document giving anyone his approval to proceed. He concluded the letter by stating that the listing agreement had expired.
 

 On August 30, 2004, Denise Strobel, a closing agent with Mahoney Title Services, faxed a letter to the Ealys and Shackelford concerning a closing scheduled for the following day. Strobel wrote that if the cash sale deed and other required closing documents were not executed and returned by the Ealys, then they would be in default of the February 12, 2004, contract of sale. On that same date, Strobel also sent a similar letter as well as the cash sale deed and original signature pages for the scheduled closing to the Ealys in California via Federal Express. The cash sale deed showed 14the sellers as being Willie, Dorothy, Ezell, and Suzanne, and the buyer as being American Capital, and it contained a sale price of $2.545 million.
 

 The Ealys did not appear at the closing.
 
 [5]
 
 American Capital placed the Ealys in default and filed a notice of default in the Ouachita Parish mortgage records for the property.
 

 On September 7, 2004, American Capital offered to buy Willie and Dorothy’s undivided one-half interest in the property. Willie and Dorothy did not respond to the offer.
 

 Century 21 contends that on September 15, 2004, it submitted an agreement to purchase the property for its listing price of $2.9 million from Willie, Ezell, and “et al.” Century 21 also submitted an offer to purchase the undivided interest of “Ezell Ealy and spouse” in the property for $1.45 million.
 

 A meeting was subsequently held in Monroe that was attended by the Ealys, Shackelford, Durham, Theus, McConnell, Jay Johnson from John Rea Realty, and Denise Strobel from Mahoney Title. The parties disagree about when the meeting was held as well as what occurred during the meeting. In any event, the meeting did not turn out as hoped by Theus and McConnell.
 

 On October 22, 2004, Theus Consulting Company filed suit against Willie and Ezell seeking specific performance of its agreement to purchase the property for $2.9 million. Century 21 intervened in the suit to recover its realtor commission. Theus Consulting contended that the listing [^agreement was a valid offer, and that it accepted the offer when it agreed to pay the listing price. The Ealys countered that the listing agreement was only a contract between them and Century 21. The trial court granted Theus Consulting’s motion for summary judgment and ordered the property sold for $2.9 million. When the Ealys failed to comply, the trial court ordered in January of 2006 that ownership of the property be vested in Theus Consulting upon the deposit of $2.9 million into the court registry. Theus Consulting Company subsequently transferred the property to Monroe 1-20 South.
 

 In
 
 Theus Consulting Co., L.L.C. v. Ealy,
 
 41,306 (La.App.2d Cir.8/23/06), 939 So.2d 495,
 
 writ denied,
 
 2006-2573 (La.12/15/06), 945 So.2d 696, this court reversed the summary judgment by relying on the provision in La. R.S. 37:1431(30) that a listing agreement is valid only if signed by all owners or their authorized attorney in fact. This court concluded that because the September 2004 agreement contained the notation, “et al”, Theus was aware there were owners other than the Ealys, and accordingly, the listing agreement was not valid and did not constitute a valid offer to sell the property. This court further concluded that even assuming that the listing
 
 *433
 
 agreement was a valid offer, the purchase agreement was not an acceptance of their offer but was a counteroffer that was never accepted by the Ealys. In addition to reversing the judgment, this court also vacated an order disbursing realtor fees to Century 21 and John Rea Realty.
 

 On April 12, 2007, Century 21 brought the instant suit against the Ealys. Among Century 21’s allegation was that the Ealys had committed a | fibad faith breach of their real estate contract. Exceptions of no cause of action, no right of action, and res judicata filed by the Ealys were denied.
 

 Following a trial on the merits in February of 2010, the trial court rendered judgment in favor of Century 21. The Ealys were ordered to pay $116,000.00 in damages, an additional $5,000.00 in damages under La. C.C. art. 1997,
 
 [6]
 
 and $38,666.67 in attorney fees.
 
 [7]
 
 Costs were assessed against the Ealys.
 

 DISCUSSION
 

 The Ealys argue on appeal that the trial court erred in finding that the listing agreement was valid, that a valid offer was made, and that the Ealys breached their warranty under the agreement. The Ea-lys further argue that the trial court erred in failing to acknowledge Century 21’s bad faith in entering into the listing agreement without the consent of all co-owners of the property.
 

 An appellate court may not set aside a trial court’s finding of fact in the absence of manifest error or unless it is clearly wrong, and where two permissible views of the evidence exist, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong.
 
 Cole v. Department of Public Safety & Corrections,
 
 2001-2123 (La.9/4/02), 825 So.2d 1134;
 
 Stobart v. State through Dept. of Transp. and Development,
 
 617 So.2d 880 (La.1993). To reverse a fact finder’s determination, the appellate court must find from the record that a reasonable factual basis does not exist for |7the finding of the trial court and that the record establishes that the finding is clearly wrong.
 
 Stobart, supra.
 

 Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact finder’s, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony.
 
 Cole, supra; Rosell v. ESCO,
 
 549 So.2d 840 (La.1989).
 

 Valid Listing Agreement and Offer
 

 Although this court previously found that the listing agreement was invalid because it did not comply with La. R.S. 37:1431(30),
 
 [8]
 
 that determination was made in an action between the Ealys and a third-party buyer who was claiming the listing agreement was a valid offer to sell that had been accepted by the buyer. In contrast, this lawsuit involves all the actual signatories to the listing agreement. The Ealys cannot utilize La. R.S. 37:1431(30) to shield themselves from having to pay the real estate commission.
 

 
 *434
 
 In
 
 Setliff v. Slayter,
 
 2009-1512 (La.App. 3d Cir.6/2/10), 38 So.3d 1230,
 
 writ denied,
 
 2010-1532 (La.10/1/10), 45 So.3d 1104, a real estate agency entered into a listing agreement with Slayter to sell a home of which Slayter was the purported owner. When the agency sued Slayter for breaching the agreement, Slayter argued that the listing agreement was not a valid contract because he was not the “proper owner” of the subject property. The appellate court rejected the argument, reasoning that the listing agreement personally bound Slayter regardless of whether he owned the property, and the property was simply the subject of the agreement.
 

 Here, the Ealys put the property up for sale because of commercial development in the area. This undeveloped property had never been placed on the market during the entire time frame since the Ealys and their spouses had acquired it from the Ealys’ parents in 1973.
 

 Century 21 obtained the listing through contact with the Ealys’ California realtor. Ezell explained that Shackelford was hired as their realtor because he was highly referred. Although Durham had 30 years of experience in real estate, the listing was primarily worked on by Shackelford, who was more involved with commercial properties.
 

 Shackelford and Durham mostly dealt with Willie regarding the property listing. They would call him about offers for the property, and Willie would provide documents to Ezell after receiving them. This caused some friction between Ezell and Shackelford, as evidenced by Ezell’s letter to him, which was also sent to Willie.
 

 Ezell’s letter was prompted by several things. First, he wanted to be involved in the negotiations. He felt that Shackelford and Willie were disrespecting him by negotiating without him and not providing him with the offers and counteroffers. Second, he objected to the $2.545 million counteroffer that Willie had signed. Third, he wanted to end the contract with Century 21.
 

 After the Ealys did not show up at the August 2004 closing, Theus met with Shackelford and told him that he would like to pay the full price |3for the property. He also wanted the Ealys to know there were no conditions preventing a sale. Shackelford brought the parties together for the meeting.
 

 The parties were unsure of the precise date of the meeting. Ezell denied that the meeting occurred in September or October of 2004 because he and Willie were busy in California celebrating their mother’s 90th birthday and preparing a condo for sale. However, McConnell threatened the Ealys with a lawsuit during the meeting. Therefore, the meeting had to have taken place between September 15 and October 22, 2004, the date when Theus Consulting filed its lawsuit against the Ealys.
 

 Theus testified that American Capital was prepared to pay $2.9 million unconditionally at that time, and that he laid a cashier’s check for that amount on the table in front of the Ealys. The Ealys said nothing. The Ealys do not deny that they remained largely silent during the meeting. The Ealys contend that no check was placed on the table. Durham testified that a check for $2.9 million was placed on the table, although he thought McConnell placed it. McConnell testified that he could not recall a check being offered to the Ealys by Theus as that would not have been how McConnell conducted a closing. There was no question that funds were available for the acquisition as the record shows that a Bank One officer wrote to Monroe 1-20 South on August 31, 2004, to confirm a $5.2 million line of credit was available for the purchase of land.
 

 
 *435
 
 There were no closing documents at the meeting, although Strobel was present and she would have been able to prepare the documents while at the meeting or the next day.
 

 |1(>A real estate agent is entitled to his commission when he has secured a purchaser ready, able, and willing to buy on vendor’s terms even though no sale is consummated because of actions of the owner.
 
 Young v. Smith,
 
 366 So.2d 982 (La.App. 1st Cir.1978).
 

 The listing agreement stated that the commission was 4% if Century 21 “presents to seller/lessor an offer and acceptance in an amount equal to or greater than the offering price, or such lesser price or terms as seller/lessor may accept, or if the property is otherwise sold, exchanged, leased, rented or disposed by Agent or any other person, including seller/lessor, during the listing period.” Emphasis added.
 

 The trial court properly found that Century 21 produced a willing buyer to purchase the property and thereby fulfilled its obligation under the valid listing agreement.
 

 Bad Faith Breach of Listing Agreement
 

 The Ealys contend that bad faith on the part of Century 21 voided any commission it was to receive. The main thrust of the Ealys’ assertion of bad faith is that Century 21 offered the property for sale even though it knew that some co-owners had not signed the listing agreement. This record, however, reflects no bad faith on the part of Century 21.
 

 Century 21 acted reasonably in taking adequate steps to ensure that the Ealys were the owners of the property. An inquiry of Ouachita Parish tax assessor records done in September of 2000 reflected that the Ealys were owners of the property. No other co-owners were listed. Durham explained that it was standard practice for Century 21 to confirm ownership of |nproperty that was to be listed by checking the tax assessor’s online database.
 

 Century 21 was aware or should have been aware of the existence of other co-owners at the time the second listing agreement was executed. The October 2001 counteroffer to PHM contained the signature of Dorothy, and it listed Suzanne, who was noted to be deceased, as one of the sellers. Nevertheless, at no point did either of the Ealys complain that the listing agreement lacked the signatures of other co-owners.
 

 Ezell testified that he never consulted his sons about selling the property because he did not know he needed their permission and thought he had authority to execute the listing agreement. He described his relationship with them as close. Ezell thought he became owner of his wife’s interest in the property when she died. Ezell stated that if Century 21 had made him aware that his sons were co-owners, he would not have had any trouble getting them to agree to list the property for sale.
 

 Although Dorothy’s name was not on the listing agreement, she was well aware that the property was being listed for sale by Century 21, and she even signed one of the counteroffers. She relied on her husband to negotiate the sale price, and she followed his lead if he told her to accept or object to something regarding the sale of the property.
 

 The trial court found that the testimony of the Ealys was not entirely credible, and it noted that they were experienced businessmen. Certainly the Ealys were not naive landowners vulnerable to any machinations of Shackelford, Theus, and McConnell. Willie, 72 years old at the time of trial, had owned a trucking business, a
 
 *436
 
 brake repair shop, and a laundromat. He had listed and sold two condos several years earlier, and he owned | ^residential investment property in three states. Ezell, who was 69 years old at the time of trial, had worked as a longshoreman and now operated a stucco company. He owned a duplex in California as an investment, although he had never been involved in the sale of investment property.
 
 [9]
 

 The trial court found that the Ealys were in bad faith when they did not go through with the sale of the property. What obviously caused the Ealys to suddenly become hesitant about selling the property for its listing price was their sense that their property had increased in value because of speculation that a frontage road was to be constructed near the property’s border along 1-20.
 

 Willie said he changed his mind about the value of the property between 2002 and 2004. He was unsure if he would have accepted a check for the asking price if one had been offered at the meeting, and his indecision had nothing to do with Dorothy. Ezell did not want to sell the property for the full listing price because he thought it was worth more. His refusal to sell had nothing to do with objections from his sons, who did not testify at trial.
 

 The record shows that on February 14, 2003, Durham sent the Ealys a letter and an article about the proposed frontage road. On September 20, 2004, the Ealys hired a commercial real estate appraiser to determine the value of the property. At the time of trial, the property was listed for sale for $12 million. Willie, Dorothy, Ezell, and his three sons had signed a listing agreement with John Rea Realty.
 

 | isThe listing agreement states under the section of “Title”:
 

 Seller/lessor agree to furnish a good and merchantable title to the purchaser. Should title not prove merchantable or should the sale fail to be consummated for any cause due to owner(s) fault, the professional fee shall nevertheless be earned and shall be paid by the seller/lessor(s) to Broker in cash.
 

 Most notably, the listing agreement stated above the Ealys’ signatures:
 

 I/WE WARRANT THAT I/WE OWN THE PROPERTY AND/OR HAVE FULL AUTHORITY TO EXECUTE THIS AGREEMENT.
 

 The Ealys cannot have it both ways. They either lacked the authority to execute the agreement on behalf of all the co-owners but warranted otherwise, or they had the authority to do so but claimed the opposite in order to escape them obligation under the listing agreement when they realized their property was possibly worth significantly more than the listing price. Regardless of how they breached the listing agreement, they did it in bad faith.
 

 CONCLUSION
 

 The trial court was not clearly wrong in finding a bad faith breach of the listing agreement. At the Ealys’ cost, the judgment is AFFIRMED.
 

 APPLICATION FOR REHEARING
 

 Before BROWN, GASKINS, PEATROSS, DREW and MOORE, JJ.
 

 Rehearing denied.
 

 [1]
 

 . The sons’ ages at the time of trial were 35, 40, and 42.
 

 [2]
 

 . Shackelford died in July of 2008.
 

 [3]
 

 . On February 16, 2004, American Capital offered $2.45 million to Willie for the property-
 

 [4]
 

 . Durham thought someone with the last name of Hakim made the offer.
 

 [5]
 

 . Willie thought he had received notice of it. Ezell claimed no knowledge of it.
 

 [6]
 

 . La. C.C. art. 1997 provides, "An obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform.”
 

 [7]
 

 . The listing agreement provided for the recovery of attorney fees if the Ealys failed to comply with the agreement for any reason within the time specified.
 

 [8]
 

 .La. R.S. 37:1431(30) defines a listing agreement as:
 

 "[A] written document signed by all owners of real estate or their authorized attorney in fact authorizing a broker to offer or advertise real estate described in such document for sale or lease on specified terms for a defined period of time. A listing agreement shall only be valid if signed by all owners or their authorized attorney in fact.”
 

 [9]
 

 . He had listed his residence for sale in the past.