WILLIAMS, J.
| plaintiff, H.D. Graphics, L.L.C., appeals a trial court judgment dismissing its claims against defendant, It’s Permanent, L.L.C. For the following reasons, we affirm.
FACTS
In December 2012, Terri Grayson, the owner of It’s Permanent, L.L.C. (“It’s Permanent”), entered into an agreement with Ali and/or Ellie Moghimi, the owners of H.D. Graphics, L.L.C. (“H.D. Graphics”). Pursuant to the agreement, .H.D. Graphics was to design and install a graphic design on the windows and door at It’s Permanent. According to the testimony at trial, Ellie Moghimi designed the graphic and “Roger,” an H.D. Graphics employee, began the installation on December 18, 2012. Ms. Grayson testified that when Roger arrived at the location, he informed her that she was required to pay for the services before he began the installation. Ms. Grayson submitted to Roger a check in the amount of $1,300, as payment for services rendered. After Ms. Grayson reviewed the invoice, she noticed a discrepancy and questioned a charge for one of the items listed. Roger consulted with Ms. Moghi-mi, who agreed to reduce the price of the services. Thereafter, H.D. Graphics issued a refund check in the amount of $100, made payable to It’s Permanent; Ms. Grayson accepted the check and cashed it.
A dispute arose between Ms. Grayson and Ms. Moghimi when Ms. Grayson expressed her dissatisfaction with the quality of the final work performed. Following a verbal confrontation, Ms. Grayson stopped payment on the $1,300 check she had submitted. Thereafter, Ms. Grayson |2wrote to H.D. Graphics and enclosed a check in the amount of $100 to reimburse the company for the refund it had offered “due to the overcharge!.]”
*938 On February 28, 2018, Ali' Moghimi[1] filed a petition for damages, alleging that H.D. Graphics had rendered goods and services to It’s Permanent, and Ms. Gray-son stopped payment on the check and failed to pay the balance owed. Mr. Moghimi further alleged that his company was entitled to a judgment in the amount of $2,665, in accordance with LSA-R.S. 9:2782.2. Attached to the petition were numerous requests for admissions of fact.
Subsequently, Ms. Grayson, on behalf of It’s Permanent, filed an answer, disputing the allegations set forth in the petition. Ms. Grayson described the work performed by H.D. Graphics as “unsightly,” and “an eye sore.” She also stated that the graphic thát had been installed contained several misspelled words which were “embarrassing” to her and her business.
On March 20, 2013, Mr. Moghimi filed a motion to compel answers to discovery, ie., the requests for admissions of fact. A hearing was held on April 11, 2018, during which the trial court noted that Ms. Gray-son had responded to the requests for admissions of fact in her detailed answer to the petition. Consequently, the court denied the motion to compel and assessed all costs to plaintiff.
|3The trial on the merits was held on August 7, 2013, during which several witnesses testified. The testimony from various witnesses indicated that the windows were installed by an H.D. Graphics employee named “Roger,” who did not testify at trial. Ms. Moghimi testified that Roger was no longer employed by her company and she did not know his whereabouts.[2]
Ellie Moghimi testified as follows: Ms. Grayson contracted with her to replace the window films on a newly repaired window at It’s Permanent; she did not ask Ms. Grayson to pay for the work in advance; it was not her business practice to require customers to pay for a job before it was completed; she personally completed the redesign work for Ms. Grayson’s business; one of her employees met with Ms. Gray-son to finalize the design and graphics; she sent Roger to complete the installation of the design; Ms. Grayson called her while the graphics were being installed and told her that the windows did “not look right”; she went to the site; the work being installed looked “normal” to her; the only thing she saw wrong was that the window had excess ink, which was a normal occurrence; once the installation was completed, the window needed to be washed to remove the excess ink; the Aquis ink used for the job at It’s Permanent required at least 72 hours to dry; the spots visible in Ms. Grayson’s photographs were only excess ink that needed to be washed from the window; Ms. Grayson informed her that she was unhappy with the work; she explained to Ms. |4Grayson that she would send someone to wash the window “in a few days”; Ms. Grayson expressed her belief that the graphic film used in the new installation was not the same as the older films used on the other windows; Ms. Grayson threatened to stop payment on the check; Ms. Grayson stopped payment on the check; Ms. Gray-son did not allow her to send her employees to remove the spots from the windows; during the installation, Ms. Grayson noticed that one of the graphic designs she had requested was not being installed; she *939 told Ms. Grayson that she would reimburse her $100 “to make [her] happy”; when she gave Ms. Grayson the $100 check, she did not believe she (Ms. Gray-son) would stop payment on her check; Ms. Grayson did not give the check to Roger until after the work was completed; Roger delivered the check to her.
At some point during her testimony, Ms. Moghimi contradicted her previous testimony that Ms. Grayson had called her to complain about the installation of the graphic film, testifying as follows: she called Ms. Grayson to thank her for the check; during that call, Ms. Grayson expressed concerns about the work; she volunteered to go to It’s Permanent to look at the work; she did not see anything wrong with the work; she told Ms. Grayson the work “look[ed] beautiful; Ms. Grayson threatened to stop payment on the check”; Ms. Grayson approved the design, including the spelling of words and names, before the design was printed; when she went to the business to view the work, she pointed out the misspelled words to Ms. Grayson, who responded, “Ellie, I don’t care about that”; Ms. Grayson told her on several occasions that she was not concerned about the | ^misspelled words in the designs; Ms. Grayson was only concerned about the windows because her employees and clients could not see outside; she did not see anything wrong with the work; it looked “perfect” from the outside; the “dots” were only visible from the inside; the windows needed to be cleaned after they completely dried; she offered to repair the work on the windows; Ms. Gray-son refused because “she did not want me touching her windows”; she offered to lower the price to correct the work; Ms. Grayson accepted, then changed her mind; the windows have not been repaired.
William Langley testified as follows: he works as a subcontractor for various sign companies; the graphic films installed at It’s Permanent are “Aqua” films; he did not see anything wrong with the graphic design/installation; the design “just looked like it wasn’t cleaned” within three to five days after it was installed; he could not tell whether the film on the other windows was Aqua.
Chris Harris testified that he had been in the business of installing vehicle graphics, decals and signs for approximately 15 years. Mr. Harris testified that he had heard of aqua-based ink, but in his business, he installed solvent-based ink. According to Mr. Harris, he had viewed the work H.D. Graphics installed at It’s Permanent and “everything looked fine to [him].” On cross-examination, he admitted that the window did not look “fine” from the “inside looking out.” When viewing the photographs, Mr. Harris admitted that he could only “partially” see out of the window.
Phillip Jarratt, an employee of Premier Cars and Trucks, testified that he had often engaged H.D. Graphics to design and install window graphics |fifor his business. He also stated that H.D. Graphics had never required him to pay for the work until after the work was completed and he had inspected it.
Jacob Duvall testified that he had contracted with H.D. Graphics to complete signs and other design work. He also stated that he had never paid for work prior to completion.
Terri Grayson testified on behalf of her company as follows: H.D. Graphics performed the original graphic design work on the windows of her business;[3] one of the windows was broken in 2012, requiring *940 her to replace the window and the graphic/film on that window; she wanted a name changed on the design and the logos removed from two of the windows; additionally, she wanted a new slogan placed on the windows; she contracted with H.D. Graphics to have the work completed; she questioned the price on the invoice before Roger began the installation; Roger agreed to issue a refund in the amount of $100; she deposited the $100 refund check and later issued to H.D. Graphics a check in the amount of $100 to reimburse it for the refund; while the work was being completed, she voiced her concern about the quality of the work; she asked Roger to stop the work; he refused to do so; she called Ellie Moghimi and asked her to come to the location to see the work; she had already submitted a check to Roger to pay for the work; she stopped payment on the check; she received a certified letter from H.D. Graphics requesting payment in the amount of the check, plus 5%, within 30 days; she did not pay the amount requested.
|7In explaining her displeasure with the work performed by H.D. Graphics, Ms. Grayson testified that it was “just bad work[;] [i]t did not look like the work that had been done to my windows in the past.” She stated that she was unable to see through the window; when she complained to Roger, he ignored her and continued working. She also testified that the design contained several misspelled words.
Henry Michael Tyson testified that he is in the business of installing window graphics similar to the one in dispute. He also testified that Ms. Grayson contacted him in January 2013, to obtain a quote to repair the work performed by H.D. Graphics. Mr. Tyson testified that the materials used by H.D. Graphics were “the standard ones that are used.” However, he testified as follows:
You should be able to see out of the window clearly through and with this job you couldn’t. It looked like when the ink printed, too much ink was sprayed out and it stuck in the perforations. And when they peeled the back off, the dried ink stayed in the holes.
Corrie Freeland, an It’s Permanent employee, testified as follows: Roger came to It’s Permanent on December 18, 2012 and told her that he was there to “start the work”; Roger stated he needed the full payment before beginning the installation; Roger showed Ms. Grayson something on a laptop computer, and then told her that he would return later to complete the job; Roger accepted the check from Ms. Gray-son; he left and returned later to begin the installation; he completed the installation the following day; Roger became angry when she and other employees told him they were unable to see out of the windows; Roger called Ms. Moghimi and left; he |sdid not mention anything about cleaning the windows; Ms. Grayson also called Ms. Moghimi; after Roger left, Ms. Moghimi came to the business accompanied by another woman; Ms. Moghimi “blew up” and began “yelling and screaming” at Ms. Grayson; Ms. Moghimi stated that she did not see anything wrong with the windows; Ms. Moghimi did not offer to repair the work; Ms. Moghimi did not say anything about washing the windows.
Tabitha Faircloth, an employee of It’s Permanent, testified as follows: she “immediately” noticed a difference in the film being used; she asked Roger whether he was using a different type of film or ink because “it looked very different”; Roger told her that he would talk to her later because “he was busy”; Ms. Grayson asked Roger to stop working because she could see an obvious difference in the film being used; Roger “would not stop”; Ms. Grayson called Ms. Moghimi; after being *941 called by Ms. Grayson, Ms. Moghimi arrived at the site and “was mad and very upset”; Ms. Moghimi “was yelling and screaming and cursing and throwing a fit”; in January 2012, she and Ms. Grayson went to see Ms. Moghimi to attempt to resolve the issue; Ms. Moghimi informed them that the window film that had been installed was water based, rather than solvent based; Ms. Moghimi told them that she would “fix the windows” by using a more expensive film.
Ms. Faircloth also testified that she was employed at It’s Permanent when the original graphics/films were installed in the other windows. According to Ms. Fair-cloth, they had never experienced a problem with the film; they had never had to have the windows washed after previous | installations; she does not remember previously seeing holes filled with ink after installations.
After hearing the testimony and reviewing the. evidence, the trial court took the matter under advisement. Subsequently, the court rendered a judgment dismissing plaintiffs claims.
Plaintiff appeals.[4]
DISCUSSION
Plaintiff contends the trial court erred in denying the motion to compel responses to discovery. Plaintiff argues that a party is entitled to obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action.
The trial court has broad discretion in regulating pretrial discovery, and its decision will not be disturbed on appeal absent a clear abuse of that discretion. Bell v. Treasure Chest Casino, L.L.C., 2006-1538 (La.2/22/07), 950 So.2d 654; Bishop v. Shaw, 43,137 (La.App.2d Cir.3/12/08), 978 So.2d 568. That discretion may be abused when the trial court denies a motion to compel which seeks information that is properly discoverable, especially where the examination of the requested information may be the only means by which a party can defend the claims against it. Bishop, supra.
In the instant case, at the hearing on the motion to compel, the trial court pointed out that Ms. Grayson, on behalf of It’s Permanent, had | inanswered plaintiffs discovery requests with her answer to the petition. The court stated, “You may not like the answer[,] but the answer is in the record.” Thereafter, plaintiff argued that Ms. Grayson had not answered the Request for Admission No. 12. The colloquy was as follows:
BY COURT: You are stating that No. 12 has not been answered?
BY MOGHIMI: That is correct sir.
BY COURT: And No. 12 states that defendant neither returned the $100.00 credit nor made a payment of $100.00 to Plaintiff.
BY MOGHIMI: That is correct.
BY COURT: Where in here did she not answer that? Because her answer is in No. 2.
BY MOGHIMI: She did not put it in No. 2.
BY COURT: But her answer is in the pleadings. Her response is in there. BY MOGHIMI: That is not the issue.
BY COURT: The issue is that you state that she did not answer.
BY MOGHIMI: Yes.
*942 BY COURT: But she has answered.
[[Image here]]
Our review of the record reveals that Ms. Grayson responded to each of plaintiffs requests for admissions of fact in her answer to the petition. Specifically, she clearly responded to Request for Admission No. 12 as follows:
[[Image here]]
2. The invoice reflected a $300 charge for design work; there was no design work. When I questioned thej_ycharge, they gave me a $100 refund. I’ve never received a corrected] invoice.
[[Image here]]
8. In response to # 12 of the Requests for Admission[s], I mailed a $100 check to HD Graphics along with the enclosed letter. The check has been cashed and I will provide a copy.
[[Image here]]
As stated above, the record supports the trial court’s conclusion that Ms. Grayson did, in fact, respond to plaintiffs requests for discovery. Therefore, we find that the trial court did not abuse its discretion in denying plaintiffs motion to compel. This assignment lacks merit.
also contends the trial court erred in failing to render a judgment in the amount of twice the value of the dishonored check, plus 5% of the value on the face of the check.
LSA-R.S. 9:2782.2 provides, in pertinent part:
A. Whenever any drawer of a check stops payment on the check with the intent to defraud or when there is no justifiable dispute as to the amount owed or the existence of the obligation, the drawer shall be liable to a holder in due course as defined in R.S. 10:3-302, or a person subrogated to the rights of such holder, for damages of twice the amount so owing, but in no case less than one hundred dollars, plus attorney fees and court costs, if the drawer fails to pay the obligation created by the check within thirty days after receipt of written demand for payment thereof substantially in the form provided for in Subsection C which notice is delivered by certified or registered mail.
B. The holder in due course may charge the drawer of the check a service charge not to exceed fifteen dollars or five percent of the face amount of the check, whichever is greater, when making written demand for payment.
* ⅜: *
(Emphasis added).
Thus, pursuant to the statute, a holder in due course of a check that is 112the subject of a stop payment order may be entitled to a penalty of “twice the amount so owing,” plus attorney fees and court costs. However, the penalty provision applies only when the stop payment is issued “with the intent to defraud” or “when there is no justifiable dispute.” LSA-R.S. 9:2782.2(A); Royal Air, Inc. v. Pronto Delivery Service, Inc., 38,939 (La. App.2d Cir.12/14/05), 917 So.2d 1197; An-cona’s Stop and Save, Inc. v. Cleo Fields & Associates, L.L.C., 2000-0760 (La.App. 1st Cir.6/22/01), 809 So.2d 170.
LSA-R.S. 9:2782.2 provides for penalties and attorney fees; it is penal in nature and must be strictly construed. Lorick v. Direct General Ins. Co. of Louisiana, 43,716 (La.App.2d Cir.1/21/09), 2 So.3d 1209; Royal Air, Inc., supra
In the instant case, we find that a justifiable dispute existed with regard to the services provided and the payment therefor; therefore, the trial court did not err in failing to apply LSA-R.S. 9:2782.2. Ms. Grayson testified with regard to her dis *943 satisfaction with the quality of the work performed by H.D. Graphics. Ms. Gray-son and her staff also testified that Ms. Grayson attempted to stop H.D. Graphics’ employee from completing the installation. However, the employee refused to stop. The testimony from the witnesses, as well as the photographs introduced into evidence, proves the opaque nature of the film placed on the windows, rendering it impossible to see out of the window from the inside. Moreover, Ms. Moghimi admitted that the excess ink made it difficult to see through the window. Additionally, Ms. Grayson testified that if the employee had not j ^required her to pay for the design and installation before the work was performed, there would have not been a dispute with regard to the stop-payment order. According to her, she simply would not have paid for it. For these reasons, we find that the trial court did not err in denying plaintiffs request for twice the value of the dishonored check, plus 5% the value on the face of the check. This assignment lacks merit.
Finally, plaintiff contends the trial court erred in dismissing its claims against defendant. Plaintiff argues that the court should have awarded “some amount” for the services rendered to defendant and court costs. Plaintiff also argues that he issued to defendant a check in the amount of $100, as a reduction in price and has been “left in the hole” for $100.
An appellate court may not set aside a trial court’s findings of fact in the absence of manifest error or unless it is clearly wrong. Where two permissible views of the evidence exist, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. Cole v. State, Dept, of Public Safety and Corrections, 2001-2128 (La.9/4/02), 825 So.2d 1134; Stobart v. State, Dept, of Transp. and Dev., 617 So.2d 880 (La.1993); State Farm Mut. Auto. Ins. Co. v. Carter, 46,608 (La.App.2d Cir.11/2/11), 77 So.3d 1036. To reverse a factfinder’s, determination, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. Stobart, supra. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder’s, reasonable evaluations of credibility and reasonable inferences of fact h4should not be disturbed upon review where conflict exists in the testimony. Cole, supra; Rosell v. ESCO, 549 So.2d 840 (La.1989).
As stated above, despite the various testimony regarding the quality of the work performed, all of the witnesses agreed that the excess ink of the newly installed graphics made it impossible to see out of the window. Additionally, the photographs admitted into evidence depicted the excess ink that was imbedded in the perforations, as well as several misspelled words on the graphics. For these reasons, we find that the record supports the trial court’s findings of fact in this case. Thus, the trial court was not clearly wrong in ruling in favor of defendant and dismissing the case. This assignment lacks merit.
CONCLUSION
For the foregoing reasons, the trial court’s judgment dismissing the plaintiffs claim is hereby affirmed. Costs of this appeal are assessed to plaintiff, H.D. Graphics, L.L.C.
AFFIRMED.

. In the petition, Mr. Moghimi's name is spelled “Moghiimi.” However, in other portions of the record, his name is spelled "Moghimi.” Throughout this opinion, we will refer to him as “Mr. Moghimi.”

. Despite Ms. Moghimi’s assertions regarding Roger's unknown whereabouts, the trial judge noted that Roger and Mr, and Mrs. Moghimi were also embroiled in some type of litigation.

. In the lower court, plaintiff, H.D. Graphics, L.L.C., was represented by counsel. However, counsel withdrew after the judgment was signed. In this appeal, plaintiff appears in proper person; the appellate brief was signed by "Ali Moghimi,” presumably, a member of the L.L.C.