DREW, J.
hBrandilyn McDonald appeals a judgment denying her claim for unpaid sales commissions and finding that her employer, Gannett River States Publishing Corporation (“Gannett”), had prevailed on its reconventional demand and was owed $671.46 from McDonald for overpayment of advance draws received by her.
Concluding that the trial court erred when calculating the alleged overpayment of advance draws paid to McDonald, we reverse the judgment, order Gannett to pay for sales commissions earned by McDonald in May and June of 2013, assess a penalty against Gannett, and order it to pay attorney fees.
FACTS
McDonald worked for Gannett from September of 2012 until June of 2013 selling ads for Delta Style magazine and special sections of the Monroe News Star.
McDonald testified about her responsibilities as an ad sales representative for Gannett. She would approach customers about buying ads in the publications, and once an agreement was reached on ad size and price, she would speak with a graphic design artist (“artist”) about what the customer wanted in the ad. After the artist created the ad, she would take the ad back to the customer, who would either make changes or approve it.
The procedure changed somewhat after the ATOL system was introduced. ATOL stands for ad tracker online and it has a separate location where artists work. McDonald believed that it was in April that she began using ATOL.
|2In order for an ad to be created, the customer’s information (name, ad size, and *1032 purpose of ad) first had to be entered into the G3 billing system. Once an order was created and a ticket number assigned, the sales rep could submit a request for an ad in ATOL, which takes everything the customer wants in the ad and creates the proof. The sales rep then sends the proof to the customer for approval or.to suggest changes. If the customer wants changes, the ad request is put back into ATOL for the artists to create, a new proof. ATOL could be bypassed if an ad was camera ready.
The ticket number and other information about the ad was put on a document referred to as a “run sheet" which is created for each magazine issue or special section. The run sheet is used by the artists to check off all the ads that had been sold that month and to ensure the ads are placed in the magazine or special section. If an ad is on the run sheet, then it is supposed to be in the magazine or special section.
McDonald claimed that she was not trained on ATOL, and that it had to be manipulated in order for it to work right. She also had to work harder using it. Her manager, Rachel Cagle, testified that she trained McDonald how to use ATOL by showing her how to put the ad components into the system.
McDonald received a. commission of 15% for ads that she sold. The commission was calculated at the end of the month, so the commissions were not paid in the month the ads were sold, but rather thé following month, when the magazines or supplements were published.[1] For example, | .¡McDonald contended that she was owed ■ commissions in June for ads that she sold in May, as well as commissions in July for ■ads that she sold in June. In addition to the commissions, McDonald received a draw in the amount of $807.68 every two weeks. The draws would be deducted from her commissions on a later date, usually the following month.
McDonald had three managing editors in the short time that she worked for Gannett. Rachel Cagle was her last managing editor.
McDonald stated that it was not until Cagle became manager that she had to turn in commission reports 'in order to receive her commissions. Shé admitted she did not have a clue what Cagle wanted, and she relied on her coworkers Yolanda Stroud and Tess Richardson to complete her commission reports. A commission report showed the account number, size of ad, client name, the commission, and any draws. Once Cagle received a commission report, she printed out an ASAT report from the G3 billing system so she could compare what a sales reps was claiming in commissions against what the customers were being billed.
McDonald ended her employment at the end of June 2013. McDonald contended she gave two weeks’ notice to Cagle before she quit, which Cagle disputed. McDonald’s cowo'rker, Tess Richardson, stated it was common knowledge that she gave two weeks’ notice.
McDonald took three days off during the week ending on June 14 and then took the following week off. When Cagle and McDonald met on Tuesday, June 25, she asked McDonald when her last day would be and was told Friday. Cagle testified that she told McDonald that she needed to |4complete all her administrative paperwork and commission reports and get the *1033 contacts for her customers on Wednesday, ■ and that on Thursday and Friday she was to take the new sales rep around to all her customers. '
While Friday, June 28, was supposed to be her last day of work, McDonald said she could not get to work on that Thursday or Friday because of problems with her vehicle. Cagle insisted that the Tuesday when they met, and not the next day, was the last day McDonald showed for work.
McDonald never received her commissions for the ads she sold in the June and July issues of Delta Style, the Best of the Delta section, and the Posh Paws special section.
McDonald texted Cagle on July 9, 2013, wanting to know the amount of her commissions for June and July. Cagle replied by asking if McDonald had turned in her commission reports, to which McDonald answered that she thought she emailed them. Cagle then texted that she could not do anything without getting these reports. Cagle also asked for the cell phone numbers of McDonald’s customers.
In August, McDonald texted Cagle regarding when she would receive her unpaid commissions. She added that Cagle should be able to pull a report to get the amount of her commissions, especially since Yolanda had to help her with the last one.
Cagle replied on August 12 that she was not sure what McDonald was expecting payment for since: (1) McDonald did not do what she had asked at that Tuesday meeting (complete administrative paperwork, check billing |Bfor correct prices,’ send a list of email addresses ’ and cell numbers for her customers, and take the new sales rep to meet her customers); (2) she did not hear from McDonald until she had to contact her on July 1 to get keys and a laptop back; (3)-McDonald did not enter tickets for the June ads correctly (on the few she did-herself); and (4) McDonald did not complete her commission reports as asked. After telling McDonald to call Arlene, Cagle finished by writing that she believed that when they discussed McDonald’s last three days on Tuesday, June 25, McDonald knew she would not come back orp do anything that had been asked of her.
McDonald testified that she did not have Arlene’s number, so she emailed her and also called Cagle’s boss, Christina Pierce, who is Gannett’s director of advertising. On September 16, she emailed Pierce to inquire about when she would receive her commissions for June and July. Pierce referred her to Rachel’s text message on August 12, and added that no commission was owed because McDonald had abandoned her position and not finished her work. McDonald responded that her lawyer would contact them.
McDonald’s attorney wrote to Pierce on September 19 that they were demanding the payment of $7,096.96 in commissions. McDonald filed suit on October 8, 2013, against Gannett alleging that she was owed $7,096.96 in commissions earned while selling ads. She also sought a penalty of 90 days’ wages as well as reasonable attorney fees.
Gannett’ filed an answer in which it contended that any alleged lack of payment of wages was caused by McDonald’s failure to follow company Impolicies by not providing Gannett with proper sales and commission information, and that it was entitled to a credit or offset for draws taken by McDonald against commissions which she did not later earn.
Gannett also filed a reconventional demand alleging that McDonald’s advance draws exceeded her commission sales, which gave her a negative balance for com *1034 pensation due to her and requiring her to reimburse Gannett for the excess in draws.
Following a bench trial, the court denied McDonald’s claim for past wages, penalties, and attorney fees. However, it granted Gannett’s reconventional demand and awarded $671.46 as reimbursement for overpayment of wages.
In its reasons for judgment, the trial court stated that it accepted McDonald’s calculations of the commissions owed to her for ad sales in May and June, but nevertheless, it found that she had failed to complete her work for a substantial portion of the ads sold by her in June. Therefore, her commission for ads she sold in June would be reduced by 30% since she completed only 70% of her work that month.
The court concluded that McDonald had earned $2,993.32 in commissions in May, and $3,604.34 (after being reduced by 30%) in June, for a total of $6,597.66. After subtracting $3,230.72 for four advances paid through June, a balance of $3,366.94 remained.
The court then addressed the reconven-tional demand that McDonald had been overpaid in advances. The court found that the advances not offset by commissions amounted to $4,038.40. Applying that amount to the |7$3,366.94 in commissions owed by Gannett to McDonald, the court found that in the end, McDonald owed $671.46 to Gannett. Penalties and attorney fees were denied since McDonald had been overpaid.
McDonald appealed the judgment.
DISCUSSION

30% reduction

McDonald contends on appeal that the trial court violated the statutory prohibition against forfeiture of wages when it reduced the July commission for Delta Style by 30%. She further contends that even if the reduction was allowed under law, the trial court was manifestly erroneous as the reduction was not supported by the evidence.
La. R.S. 23:631 states, in part, regarding payment after termination of employment:
(A)(1)(a) Upon the resignation of any laborer or other employee of any kind whatever, it shall be the duty of the person employing such laborer or other employee to pay the amount then due under the terms of employment, whether the employment is by the hour, day, week, or month, on or before the next regular payday for the pay cycle during which the employee was working at the time of separation or no later than fifteen days following the date of resignation, whichever occurs first.
(B) In the event of a dispute as to the amount due under this Section, the employer shall pay the undisputed portion of the amount due as provided for in Subsection A of this Section. The employee shall have.the right to file an action to enforce such a wage claim and proceed pursuant to Code of Civil Procedure Article 2592.
Generally, when sale commissions are at issue, the inquiry of whether a wage was actually earned focuses on what work associated with the sale | sremained at the time of the employee’s discharge. Schuyten v. Superior Systems, Inc., 2005-2358 (La.App. 1st Cir.12/28/06), 952 So.2d 98.
An appellate court may not set aside a trial court’s finding of fact in the absence of manifest error or unless it is clearly wrong, and where two permissible views of the evidence exist, -the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong. Cole v. Dept. of Public Safety & Corr., 2001-2123 (La.9/4/02), 825 So.2d 1134; Stobart v. *1035 State through Dept. of Transp. & Dev., 617 So.2d 880 (La.1993). To reverse a fact finder’s determination, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. Stobart, supra.
Even though an appellate court may feel its own. evaluations and inferences are more reasonable than the fact finder’s, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Cole, supra; Rosell v. ESCO, 549 So.2d 840 (La.1989).
According to Cagle, McDonald did not finish the processes and procedures to complete the July ads to get them to print. More specifically, she did not finish getting the ads approved by customers, or getting some of the ads completely built so they could be sent to the eústomers as a proof. Although Cagle testified that she would have to check emails to determine which ads did not get approved by McDonald, she guessed that McDonald did not finish 90% of the ads, considering when she left, the manner in |flwhich she left, and the long hours that had to be worked to get the ads completed.
Cagle testified that Tess Richardson finished most of McDonald’s work that had been left incomplete. Both she and Richardson added information to the run sheet for the July issue after McDonald had left, although Cagle could not recall what specific information was added.
Richardson testified that she helped Ca-gle correct McDonald’s billing after she left, although she conceded that 90% of McDonald’s accounts had correct billing. We note that Richardson stated that she wanted to wring McDonald’s neck because of the work that McDonald left behind that she had to do. Richardson recalled that she probably had to put in extra hours to finish up McDonald’s sales work, and that she had to go back through the G3 system and make sure it was all done correctly. Richardson was not paid for her extra work.
Cagle also thought that McDonald failed to finish her job and abandoned her position because McDonald told her on Tuesday, June 25, that June 28 would be her last day, but then she never returned to work. Thus, not only did McDonald not finish her work related to the July issue, but she also neglected to do what was asked of her that last week.[2]
McDonald testified that she put July’s ads in the system before she left, and that all her ads were published. She was not sure why Cagle thought she did not do 90% of the work with the ads she sold for July. Her 110customers approved the ads that were created, and everything was completed. She did not know what Richardson had to do to complete her work for the July issue, other than correct billing or do some resizing of the ads. McDonald acknowledged that the magazine layout still had to be done, but she insisted that she did all the work that she was supposed to do for the July ads and there was nothing else for her to do.
We discern no legal impediment to the trial court reducing McDonald’s commission by 30%. Moreover, we do not find that the trial court was clearly wrong in making the reduction under the facts presented. The trial court obviously accepted Cagle’s testimony that McDonald left Gan- *1036 nett’s employment without performing a significant part of the work regarding her ads in the July issue.

Errors in calculation

McDonald was given five draws after receiving her last commission check on May 10. The dates of those draws were May 10, May 24, June 7, June 21, and July 5. Draws given on April 12 and April 26 had reduced her commission check received on May 10.
As noted earlier, the trial court reduced the $6,597.66 total for the June and July commissions by $3,230.72 to account for four draws that had not already been used to reduce eommissiops. This left McDonald with a balance owed to her of $3,366.94. The trial court then concluded that this amount was offset by $4,038.40, which represented the last five draws. Since.only five draws in total had not been used prior to trial, to reduce | n commissions, the trial 'court erred in its calculation by counting four of the five draws twice against McDonald’s commissions.
McDonald claims that when the trial court calculated the June commission as $2,993.32, it failed to include three commissions totaling $371.17. However, we note that at the conclusion of trial, McDonald’s counsel told the court that McDonald claimed she was owed $2,993.32 for June. Thus, the trial court was correct that the total commissions for June and July amounted to $6,597.66. Next, the last five advance draws totaling' $4,037.90 are sub-, tracted ■ from that amount, leaving $2,559.76 as what is owed to McDonald in commissions;

Penalties and attorney fees

Because Gannett failed to comply with La. R.S. 23:631, we must consider whether McDonald is entitled to a penalty arid attorney fees under La. R.S. 23:632, which states:
A. Except as provided for in Subsection B of this Section, any employer who fails or'refuses to comply with the provisions of R.S. 23:631 shall be liable to the employee either for ninety days wages at the employee’s daily rate of pay, or else for full wages from the time the employee’s demand for payment is made until the employer shall -pay or tender the amount of unpaid wages due to such employee, whichever, is the lesser amount of penalty wages.
B. When the court finds that an employer’s dispute over the amount of wages due was in good faith, but the employer is subsequently found by the court to owe the amount in dispute, the employer shall be liable only for the amount of wages in dispute plus judicial interest incurred from the date that the suit is filed. If the court determines that the employer’s failure or refusal to pay the amount of wages owed was not in good faith, then the employer shall be subject to the penalty provided for in Subsection A of this Section.
Iip.C. Reasonable attorney fees shall be allowed the laborer or employee by the court which shall be taxed as costs to be paid by the employer, in the event a well-founded suit for any unpaid wages whatsoever be filed by the laborer or employee after three days shall have elapsed from time of making the first demand following discharge or resignation.
.To recover penalties under La. R.S. 23:632, a claimant must establish that wages were due and owing, that demand for payment was made where the employee was customarily paid, and that the employer did not pay upon demand. Becht v. Morgan Bldg. & Spas, Inc., 2002-2047 (La.4/23/03), 843 So.2d 1109, cert. denied, *1037 540 U.S. 878, 124 S.Ct. 289, 157 L.Ed.2d 142 (2003). Because La. R.S. 23:632 is penal in nature, it must be strictly construed. Smith v. Acadiana Mortg. of La., Inc., 42,795 (La.App.2d Cir.1/30/08), 975 So.2d 143. A good-faith non-arbitrary defense to liability for unpaid wages, i.e., a reasonable basis for resisting liability, allows a court to excuse the employer from the imposition of additional penalty wages. Beard v. Summit Institute of Pulmonary Med. & Rehab., Inc., 1997-1784 (La.3/4/98), 707 So.2d 1233.
The amount that -McDonald claimed was owed to her was a moving target for Gan-nett. When McDonald emailed Christina Pierce on August 30, she claimed she was owed $7,096.96. This figure was repeated in the September 19 demand letter. McDonald testified that she again used the $7,096.96 amount in response to a discovery request. However, she later reduced that amount to $5,851.68 when she deducted two draws that she had left out when doing her calculations. This was the amount asserted in a rule to show cause filed by her. At trial, she contended she was owed $5,015.09.
|1sIn McDonald’s defense, she was compiling what she believed she was owed from her notes and from run sheets that she had gathered while still working. The run sheets are updated continuously, so she would not have had access to the latest run sheet for the July issue when she stopped working.
There was much dispute about whether Cagle needed McDonald to submit commission- reports for McDonald to obtain her commissions for June and July. Cagle testified that the sales reps are responsible for turning in the commission report and making sure the proper information was in ATOL and on the run sheet. They do not get paid their commissions when they do not turn in their commission reports or complete all the steps required for ads to be published. Richardson beliéved it was Cagle’s job to calculate the commissions. She recalled that an earlier manager named Debbie had done the commission reports.
The commission report for May sales should have been completed a month before McDonald’s last day. Cagle texted McDonald on June 14 to ask her if she had finished her commission .report for her May sales. McDonald’s response was that she had left her phone, charger.
McDonald testified that she sent a handwritten list of her ad sales to Cagle and Christina Pierce in August or September so that they would know her commissions. The list was created from information she gleaned from run sheets as well as her notes.
McDonald testified that Cagle could havé looked at the run sheets to figure how much in commissions was owed. The run sheets showed the ads 114sold for each issue along with the sales rep’s tame. Tess Richardson also testified that the commissions could be figured from the run sheets. Cagle acknowledged that a run sheet could be used as a basis to make a commission report since the info was already in there as an Excel spreadsheet for the sales reps to copy and paste what they had sold. However, she disagreed that all she needed to do was to look at the run sheets in order to figure out- McDonald’s commissions.
McDonald depended on others to complete her commission reports. Cagle was unaware whether Yolanda Stroud helped McDonald prepare her commission reports, but she knew that Tess Richardson helped McDonald on occasion. Richardson felt that it was not hard to create the commission reports since it involved only cutting and pasting information from the *1038 ran sheets. McDonald testified that Pierce told Richardson to help her with the commission reports.
Cagle did not recall receiving McDonald’s handwritten copy of her commissions that were due, and thought she may have seen it for the first time at defense counsel’s office. McDonald stated that she emailed her list of commissions to Cagle, then emailed it again when asked about it.
Cagle conceded that not turning in her commission report was the only work McDonald did not complete for the June issue, and that was the reason that she was not paid her commission for the ads she sold in May. Accordingly, Gannett’s dispute regarding, the amount owed as the June commission was not in good faith, and McDonald is entitled to a penalty assessed against Gannett.
11sThe same cannot be said regarding the dispute surrounding the July commission. In good faith, Gannett contested McDonald’s entitlement to this commission in light of her leaving tasks undone and ad sales incomplete when she left. Moreover, a substantial amount in advance draws had been paid but had yet to be offset against future commissions as intended.
McDonald asks that this court use the month of June, or the July commission, to measure the penalty of 90-day wages. The July commission was $3,604.34. That amount is to be reduced by $2,423.04, representing the draws given on June 7, June 21, and July 5,[3] leaving a total of $1,181.30 for the purpose of calculating a penalty. Therefore, a penalty of $3,543.90, or three times $1,181.30, is to be assessed against Gannett.
McDonald is also entitled to an award of attorney fees. We determine that an award of $3,000.00 in attorney fees is a reasonable award in this matter.
CONCLUSION
The judgment is REVERSED. McDonald is entitled to $2,559.76 in unpaid commissions. A penalty of $3,543.90 is assessed against Gannett and awarded to McDonald. Attorney fees of $3,000.00 are awarded to McDonald. Costs are to be paid by Gannett.

. The customer is billed the month after the magazine issue or special section is published,

. McDonald testified that while Cagle asked her to show her replacement around at the end of the week, she received mixed messages because Cagle also told her that she did not know if the job would be offered or accepted.

. The May draws would have been deducted from the June commission.