Judgment rendered May 25, 2022.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 54,513-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

BEVERLY LOWERY                                    Plaintiff-Appellant

versus

ST. FRANCIS MEDICAL                               Defendant-Appellee
CENTER

* * * * *

Appealed from the
Fourth Judicial District Court for the
Parish of Ouachita, Louisiana
Trial Court No. 2018-3400

Honorable Daniel Joseph Ellender, Judge

* * * * *

RICHARD L. FEWELL, JR., APLC            Counsel for Appellant
By: Richard L. Fewell, Jr.


NELSON, ZENTNER, SARTOR &               Counsel for Appellee
SNELLINGS, LLC
By: George Marion Snellings, IV


* * * * *

Before COX, THOMPSON, and ROBINSON, JJ.

**ROBINSON, J.**

Beverly Lowery filed suit against St. Francis Medical Center ("St. Francis") in Monroe alleging that she sustained injuries to her skin when she smelled a cleaning solution while her late husband was a patient at St. Francis. Following a bench trial, the court found in favor of St. Francis and rendered judgment dismissing all of Lowery's claims against St. Francis.

We affirm the judgment.

## FACTS

Lowery's husband was admitted to St. Francis in September of 2017. He died on December 24, 2017. Except for a few instances, she remained with him at the hospital throughout the duration of his stay there.

On November 4, 2017, Lowery attempted to get some rest in her husband's hospital room while he was receiving kidney dialysis. She claims that she was awakened by a very strong smell of chemicals. When she went to the open door of the room, she saw hospital workers in hazmat-looking outfits spraying a chemical on the walls in a room that was cater-corner across the hall from her husband's room. She closed the door to her room. She claimed that she began experiencing skin ailments after being exposed to the chemical.

Sixteen days after the alleged exposure, Lowery sought treatment from her physician, Dr. Joe Byron Henry, who is a family medicine specialist. He first treated Lowery on December 30, 2014, when he diagnosed her as having uncontrolled diabetes, hypertension, coronary artery disease, and a diabetic ulcer on her foot. She was also overweight.

When Dr. Henry saw Lowery on November 20, 2017, she complained of blisters and pain after being exposed to chemicals. She reported that she was exposed to chemicals on November 4, started having an ant-bite type reaction, and later developed facial swelling, leg irritation, and painful skin peeling on her legs. Upon examining Lowery, Dr. Henry noted that she had edema to her lower extremities with swelling that was worse on the left. There was also confluent redness on her left leg with warmth, as well as some pitting edema. Dr. Henry also noted an ulcer on her left lateral thigh that was the size of a compact disc. There were red papules on the lower part of her right leg. His assessments were skin ulcer on the left thigh which Lowery said started with a rash from chemical exposure, cellulitis, and edema. Lowery also told him that she had resolved facial edema.

Lowery made a follow-up visit to Dr. Henry on November 27. She reported that blisters and wounds to her lower extremities had dried out somewhat. She said she was doing better overall but still had pain in her legs. There was no further facial swelling, but she had developed a new rash on her arms. He did not think the new rash was related to her alleged exposure. The medical records reflect that her edema had lessened, and the ulcer on her left thigh was healing. He referred her to a dermatologist, Dr. Kimberly Mills, concerning the edema.

Dr. Henry treated Lowery next on December 11. He noted that Lowery was improving and she had finished the antibiotic Bactrim. There was no drainage or discoloration from an abscess pocket. Examination showed that swelling and redness to her left lower leg had lessened. Some wounds were present but were much smaller than on prior treatment dates.

Dr. Henry treated her again on January 11, 2018. He noted that the edema was improving. He also noted that the cellulitis had improved significantly, but had been flaring up a little lately.

Dr. Henry treated her on February 8, 2018. He noted that there was less redness on the lower one-third of her left leg and the edema was much less. He prescribed doxycycline in the event there was a recurrence of cellulitis. When Dr. Henry saw Lowery on June 5, 2018, he noted some foot issues that were unrelated to the alleged exposure.

On October 17, 2018, Lowery filed suit against St. Francis. Lowery claimed her doctor diagnosed her as having cellulitis that was triggered by bacteria or another source such as the chemical being used across the hall. She also claimed that she never had these types of skin problems or cellulitis prior to her exposure on November 4.

*Trial*

A bench trial was held in this matter on October 1, 2020. Artis Caraway is related to Lowery's late husband. He would regularly visit them at the hospital. On one occasion, he noticed that Lowery's eyes were almost swollen shut and her legs were swollen and red. It looked like she had sores with blisters on her skin. When he asked her what caused it, she said it was caused by fumes from a cleaning solution being used in a room across the hall.

Beverly Lowery testified that her husband was in the hospital for over three months, and she left his side only three times. She described her alleged exposure to the chemical being used to clean the room across the hall. She smelled something very strong that woke her up, and she jumped

3

up from a recliner and ran to the open door of the room. She saw workers in "hazmat looking clothes" spraying something on the walls and mopping them down in a room across the hall. The chemical was so strong that she closed the door. The smell made her sick to the stomach, and then later on, she started feeling funny in her chest and her eyes were burning. She eventually felt funny all over and started breaking out in little clear blisters all over her body.

Lowery described the protective clothing worn by the workers as covering everything, and the workers were wearing gloves and masks. She could smell the odor the rest of the day, but could not smell it as bad with the door closed. She told her daughter to cover her face when she returned to the hospital.

Lowery denied that she had ever experienced blisters or skin conditions like those treated by Dr. Henry. She claimed that her skin condition was still affecting her at the time of trial. She related that she had spots and tenderness on her legs, as well as some open sores. She never sought treatment for her skin condition from any physician other than Dr. Henry.

Lowery claimed that she reported the odor to nurses and aides that day when they came into the room. She also told her husband's doctor when he came into the room. She did not think to tell anyone at the hospital not to return her husband to the room because of the smell. She did not ask for her husband to receive a different room.

Following the alleged exposure, she asked her husband's doctor to look at her skin condition because Dr. Henry was out of town, but he refused

4

to do so. She also declined to seek treatment at St. Francis's Emergency Room because she was worried that she would be admitted to the hospital and did not want to leave her husband's side.

Kay Hires is Lowery's daughter. She saw her father every day at the hospital, and would stay with her parents during the day and for most nights. She recalled that on November 4, her mother called her and warned her to cover her face when she returned to the hospital because of a strong smell on the floor. She testified that her mother's skin looked normal when she left, but her mother's body and face were red all over when she returned. It was not just the exposed skin that was reacting. Later, her mother's skin began flaking, and she was in much pain. She had never seen her mother with that skin condition before. Hires claimed that her mother still had oozing and skin breakouts on her legs, and there are permanent spots on her face.

Hires testified that she reported the smell at St. Francis to a lady over the phone. She also testified that she inquired with personnel at the floor's nursing station about her father being moved to a different room. Hires offered to take her mother to the Emergency Room, but she declined.

Gerald McCloskey, III, was the risk manager at St. Francis on November 4. At the time of trial, he had been the risk manager for six years. The first time he became aware of the alleged exposure was when Lowery's attorney wrote to him in 2018. St. Francis uses a third-party vendor to provide housekeeping services. McCloskey spoke to Anita Johnson, the director of environmental services at St. Francis who supervises the housekeeping workers. She provided the names of the chemicals used to clean. Virex is one of the chemicals used. McCloskey did not know

5

whether the chemicals were diluted or undiluted when being used on the date in question. He has never been told of anyone at the hospital having a similar reaction during his six years at St. Francis. There was no incident report filed.

McCloskey explained that every room is cleaned with Virex or bleach before a new patient occupies it. Virex is used to kill major blood-borne pathogens. He did not know exactly which chemical was used that day as St. Francis does not keep track of that information. He denied that anyone at St. Francis wears a hazmat suit. He acknowledged that cleaning crews will wear personal protective equipment when the prior occupant of the room had a pathogen. Thus, if anything was worn, it was not actually worn for the chemicals themselves. The Material Safety Data Sheet ("MSDS") for Virex says that when undiluted, inhalation of it may cause irritation and corrosive effects to the nose, throat, and respiratory tract, and symptoms may include coughing and difficulty breathing.

Dr. Henry testified as an expert in family medicine. He explained that Lowery's diabetes was pretty well controlled while he treated her, but she had infections to her feet from time to time.

He recalled that when he treated her on November 20, she had swelling and redness on her body, particularly her legs, and was developing some sores on her legs. He noted there was some residual swelling to her face. He thought her condition was more consistent with possible bacterial cellulitis on her legs. However, she had some irritation on her arms that was not consistent with bacterial exposure, so he was concerned at the time that the cause could be an underlying disease such as diabetes or a circulatory

6

problem. Tests ruled out an underlying disease, and her symptoms remained consistent with a bacterial superimposed infection.

Dr. Henry explained at trial that cellulitis can be caused by exposure to a chemical or some kind of irritant. He thought that Lowery experienced some kind of an irritant exposure that caused generalized swelling, which led to a focal breakdown of her skin that allowed a bacterial superimposed infection. Dr. Henry thought the sequence of events started with an irritant exposure about two and a half weeks before he saw her on November 20. Based on photographs and her account of what happened, he believed Lowery's face, upper extremities, and lower extremities were affected by exposure to the irritant.

Dr. Henry had treated Lowery for chronic foot issues in the past that were related to her diabetes and weight problems, but had never treated her for swelling or issues with facial, upper extremity, or lower extremity skin problems. He had never seen her with those symptoms before November 20. Dr. Henry did not think the irritant would cause the same reaction over her entire body because the quantity and duration of exposure could lead to a varying pattern.

Dr. Henry thought Lowery's cellulitis was resolving when he examined her on December 11. When he examined her on February 8, he did not think that there was anything additional occurring with her, and he did not suspect there was residual cellulitis at the time. She only had non-residual swelling, and there was no active inflammatory process. He thought it was fair to say that from February 8 onward she did not present with any complaints due to the alleged exposure. When he next saw her on June 5,

7

there was nothing indicating that she still had residual effects from the alleged exposure. He was not aware if there was any permanent scarring.

In summary, Dr. Henry thought it was more likely than not that the cellulitis and swelling were caused by an irritant, namely the cleaning chemical that she smelled at St. Francis. He reached his conclusion by taking her description of symptoms at face value, seeing the distribution of swelling at first, dealing with the secondary effects afterward, and not having a clear explanation of how else to prove it. He believed her symptoms were consistent with some kind of irritant exposure, which would have been the chemicals that she smelled.

Dr. Kimberly Mills testified by deposition as an expert in dermatology. She never personally examined Lowery. She reviewed her medical records from Dr. Henry, Lowery's deposition, photos attached to her deposition, the MSDS for the cleaning chemicals that may have been used, and the lawsuit petition.

Dr. Mills opined that it was more probable than not that Lowery's skin conditions were not caused by exposure to the cleaning chemical. She disagreed with Dr. Henry that Lowery's skin conditions were caused by chemical exposure.

Dr. Mills explained that when she thinks of chemical exposure, she thinks of contact, but Lowery's lesions were not on areas that would have been exposed. Dr. Mills added that her understanding was that Lowery had not come into contact with the liquid chemical itself. The location of the injuries was one of the reasons that she did not think Lowery had chemical burns. The chemicals did not make direct contact with the skin, which is the

8

most common way to get a chemical burn. If there was an airborne exposure, she expected that Lowery would have had the same lesions on her face as she had elsewhere on her body. Also, she expected Lowery's shins to be the part of her legs most likely in contact with the chemical, not behind the knees or higher on her thighs. In summary, if a chemical was sprayed, she expected to see the effects on Lowery's face, arms, and anterior surfaces of the legs, not the posterior surfaces or bends of her knees.

Dr. Mills explained that her opinion is based on the fact that because Lowery's exposure was through the air, it would have affected other parts of the body. Dr. Mills believed that if Lowery had been exposed through the air, then there would have been a different pattern of skin damage, and Dr. Mills expected it to affect Lowery's face. She never saw photos showing lesions on her face. Lowery did not have lesions where Dr. Mills thought they would be.

Dr. Mills acknowledged that she cannot say for certain what caused the skin problems. There were several different things which could have occurred. It would have been more helpful to determine a cause if Lowery had sought medical treatment directly after exposure instead of waiting two weeks. Dr. Mills noted that Lowery had underlying medical issues and had been at the hospital for two months taking care of her husband, and it would have been hard for Lowery to take care of herself under those circumstances.

*Reasons for judgment*

In his oral reasons for judgment, the trial judge concluded that there was insufficient evidence that it was more likely than not that what Lowery was exposed to at St. Francis caused her skin conditions.

The trial judge found Lowery to be generally credible. However, he found her to be prone to exaggeration about certain things. For example, she described the workers as wearing hazmat suits. Her medical records also did not support her allegation of permanent scarring or the level of pain that she claimed. The trial judge also found it a little problematic that Lowery did not obtain medical treatment for sixteen days, especially since she was already at the hospital.

The trial judge noted that there was no medical testimony supporting the assertion that inhalation of the chemical caused her condition, or that Lowery had a unique skin condition that made her particularly sensitive to an aerosolized exposure to the chemical.

Lowery has appealed the adverse judgment.

## DISCUSSION

Lowery argues on appeal that the trial court erred in finding that she did not carry her burden of proof and there was insufficient evidence presented to support her claim that she never had these symptoms prior to the chemical exposure. She contends that her testimony along with her treating physician's testimony carried sufficient weight to meet her burden of proof.

In a personal injury lawsuit, the plaintiff has the burden of proving by a preponderance of the evidence a causal connection between the accident and injuries. *Maranto v. Goodyear Tire & Rubber Co.*, 94-2603 (La. 2/20/95), 650 So. 2d 757; *Davis v. Wheeler*, 53,233 (La. App. 2 Cir. 3/4/20), 293 So. 3d 173, *writ denied*, 20-00781 (La. 10/14/20), 302 So. 3d 1124. The plaintiff satisfies this burden by proving through medical and lay testimony

10

that it was more probable than not that the injury was caused by the accident. *Id.*

To obtain the benefit of the presumption of causation described in *Housley v. Cerise*, 579 So. 2d 973 (La. 1991), a plaintiff must show that (1) she was in good health prior to the accident at issue; (2) subsequent to the accident, symptoms of the alleged injury appeared and continuously manifested themselves afterward; and, (3) through evidence, either medical, circumstantial or common knowledge, a reasonable possibility of causation between the accident and the claimed injury. If a plaintiff can show these three elements, then she is entitled to a presumption of causation and the burden of proof shifts to the defendant to prove some other particular incident could have caused the injury of which the plaintiff complains. *Goldsby v. Blocker Through Dept. of Transp. & Dev.*, 51,584 (La. App. 2 Cir. 9/27/17), 244 So. 3d 703.

Whether an accident caused a person's injuries is a question of fact, and an appellate court may not set aside a finding of fact made by a judge or jury in the absence of manifest error or unless it is clearly wrong. *Davis v. Wheeler*, *supra*.

To reverse a factfinder's determination, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. *Stobart v. State through Dept. of Transp. & Dev.*, 617 So. 2d 880 (La. 1993). Even if an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon

11

review where conflict exists in the testimony. *Cole v. State Dept. of Public Safety & Corr.*, 01-2123 (La. 9/4/02), 825 So. 2d 1134; *Rosell v. ESCO*, 549 So. 2d 840 (La. 1989). Moreover, where the factfinder's conclusions are based on determinations regarding the credibility of the witnesses, the manifest error standard demands great deference to the trier of fact because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. *Rosell*, *supra*.

Based on our examination of the record, we cannot conclude that the trial court was clearly wrong or manifestly erroneous in determining that Lowery failed to prove it was more likely than not that her skin condition was caused by what she was exposed to at St. Francis on November 4.

Lowery never entered the room being cleaned. She did not go into the hallway. The cleaning solution was not being used in the hallway. She did not have chemicals sprayed on her, and there was only a smell or odor that she inhaled.

Despite claims from Lowery and her daughter that complaints were made to hospital employees about the chemical exposure, no incident report was generated. Gerald McCloskey, who had been the risk manager at St. Francis for six years, could not recall anyone else at the hospital ever having a similar reaction to the cleaning chemical.

The MSDS for Virex stated it was not classified as hazardous when diluted, and no specific first aid measure was required if the diluted product was inhaled. For inhalation of an undiluted product, the MSDS recommended that the person be removed to fresh air and kept comfortable

for breathing. No personal protective equipment was required for use of diluted Virex under normal conditions. In regards to respiratory protection when used in an undiluted state, the MSDS recommended suitable respiratory equipment if ventilation was insufficient. The MSDS stated that inhalation of Virex may cause irritation and corrosive effects to the nose, throat, and respiratory tract.

Lowery did not seek immediate medical attention after she claimed she suffered an injury. Despite already being at a hospital, she waited sixteen days until her treating physician returned before obtaining treatment. She also remained in the hospital room with her husband despite the lingering chemical smell that, while it may have been lessened by the closed door, was still present that day. We note that the smell was so strong as to awaken Lowery through the open door to her husband's hospital room.

The trial judge was presented with competing expert medical conclusions, and he was able to give appropriate weight to the expert testimony. The trial judge determined that there was no medical testimony that inhalation caused the symptoms or that Lowery had some unique condition that made her particularly sensitive to an aerosolized exposure. Interestingly, on November 27, Dr. Henry had referred Lowery to Dr. Mills for examination of Lowery's edema.

## CONCLUSION

For the foregoing reasons, we conclude that the trial judge was not clearly wrong or manifestly erroneous in determining that Lowery had failed to establish that the alleged chemical exposure caused the injuries to her skin. At Lowery's appeal costs, the judgment is **AFFIRMED**.